237 P.3d 1109

**STATE of Hawai'i, Respondent/Plaintiff–Appellee**

v.

**Jason Keliikoaikaika KALAOLA, Petitioner/Defendant–Appellant.**

**No. 29163.**

Supreme Court of Hawai'i.

Aug. 19, 2010.

Henry P. Ting, Deputy Public Defender, for respondent/defendant-appellant.

Anne K. Clarkin, Deputy Prosecuting Attorney, for petitioner/plaintiff-appellee.

MOON, C.J., NAKAYAMA, and RECKTENWALD, JJ.; with ACOBA, J., concurring separately and dissenting, with whom DUFFY, J., joins.

Opinion of the Court by
RECKTENWALD, J.

Petitioner/Defendant–Appellant Jason Kel-
iikoaikaika Kalaola was charged with one
count of failure to disperse in violation of
Hawai'i Revised Statutes (HRS) § 711–1102
(1993),[1] following an incident at Aloha Tower
Marketplace (ATM) in which police were
called to respond to an unruly crowd. At
trial, the State presented evidence concern-
ing Kalaola's conduct on both the second and
first floors of ATM, and argued that Kalao-
la's failure to disperse from either floor was
independently sufficient to support a convic-
tion. The jury found Kalaola guilty, and a
timely appeal followed. On appeal, the ICA
concluded that the trial court erred in im-
properly instructing the jury, but held that
there was sufficient evidence to support the
conviction. *State v. Kalaola*, No. 29163, 2009
WL 1507291, at *2–3 (Hawai'i App. May 29,
2009). Accordingly, the ICA vacated the cir-
cuit court's judgment and remanded the case
for a new trial. *Id.* at *3.

Kalaola timely petitioned this court for a
writ of certiorari to review the ICA's June
26, 2009 judgment. In his application, Kalao-
la argues that the conviction was not sup-
ported by sufficient evidence and that, ac-
cordingly, it should be reversed rather than
remanded for a new trial. The State did not
petition this court for review of the ICA's
judgment remanding to the circuit court for
further proceedings, and did not file a re-
sponse to Kalaola's application to this court.
Accordingly, the ICA's finding of trial error
with regard to the jury instructions is undis-
puted. The remaining question is whether
the evidence presented at trial was sufficient
to support Kalaola's conviction.

We hold that sufficient evidence was pre-
sented to establish that Kalaola failed to
disperse from the first floor of ATM, but that
there was insufficient evidence to establish
that Kalaola failed to disperse from the sec-
ond floor. We further hold that the double
jeopardy clause of the Hawai'i Constitution
does not bar a retrial of Kalaola with regard
to his alleged failure to disperse from the
first floor, for which there clearly was suffi-
cient evidence adduced at trial to support a
conviction under HRS § 711–1102.

Although no Hawai'i cases address double
jeopardy in the context of the specific factual
situation at issue here, we are guided by our
prior double jeopardy cases. In a variety of
cases involving reprosecution after a jury
verdict, this court has repeatedly recognized
that, as long as there was sufficient evidence
presented to support the conviction of the
defendant for the charged offense, the double
jeopardy clause bars a retrial only when
there was in fact an acquittal, whether ex-
press or implied. Such was not the case
here, since the jury convicted Kalaola.

We therefore vacate Kalaola's conviction
and remand for a new trial with regard to
the events that transpired on the first floor.

## I. Background

The following facts, taken from the record
on appeal and the transcripts of the proceed-
ings before the trial court, are relevant to the
consideration of the issues presented here.[2]

Kalaola was charged by way of complaint
with one count of failure to disperse in viola-
tion of HRS § 711–1102(1). The complaint
against Kalaola alleged:

> On or about the 19th day of May, 2007,
> in the City and County of Honolulu, State

---

1. HRS § 711–1102 (1993) provides in pertinent
part:
 **Failure to disperse.** (1) When six or more
 persons are participating in a course of disor-
 derly conduct likely to cause substantial harm
 or serious inconvenience, annoyance, or
 alarm, a peace officer may order the partici-
 pants and others in the immediate vicinity to
 disperse.
 (2) A person commits the offense of failure
 to disperse if the person knowingly fails to
 comply with an order made pursuant to sub-
 section (1).

2. For the purposes of this analysis, we consider
 the evidence in the light most favorable to the
 State. *See State v. Richie*, 88 Hawai'i 19, 33, 960
 P.2d 1227, 1241 (1998) ("Evidence adduced in
 the trial court must be considered in the strong-
 est light for the prosecution when the appellate
 court passes on the legal sufficiency of such
 evidence to support a conviction") (quoting *State
 v. Quitog*, 85 Hawai'i 128, 145, 938 P.2d 559,
 576 (1997)) (brackets omitted).

of Hawaii, [Kalaola], as one (1) of six (6) or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm, or as a person in the immediate vicinity, failed to obey a law enforcement officer's order to disperse, in violation of Section 711–1102(1) of the [HRS].

At trial, the State's only witnesses were police officers who encountered Kalaola at ATM on the night of the alleged incident. For example, Officer Keani Alapa (Officer Alapa) testified he was dispatched to ATM because of a report of "approximately 50 people fighting." Upon arriving at ATM, Officer Alapa and Officer Ryan Kaio (Officer Kaio) encountered "multiple fights going on, approximately maybe 50 to 75 people fighting" on the second floor of ATM. Officer Alapa testified that he observed fighting over "pretty much the whole area" of the second floor.

Officer Alapa testified that he observed Kalaola on the second floor "calling people out, challenging people to fight." Officer Alapa further testified that he addressed the "general group" of which Kalaola was a part and ordered them to leave at least ten times. Officer Alapa testified that Kalaola did not leave at that time, but that the officers "eventually got a lot of people to leave the second floor and (inaudible) proceed down to the parking lot where some other incidents ignited down there." Officer Alapa testified that it took approximately 20 minutes before the crowd started to go downstairs, and that he also eventually proceeded to the first floor, where he "saw [Kalaola] again on the sidewalk."

Sergeant Albert Lee (Sergeant Lee) testified that, when he arrived at ATM, he saw "about 50" people "streaming out, they were still all yelling at each other, had some small fights breaking out." He testified that he also saw Kalaola "streaming out" of the second floor, yelling and swearing. Sergeant Lee testified that he approached Kalaola and "told him to leave the area." Sergeant Lee further testified that, when he approached Kalaola, Kalaola was yelling and cursing at other people in the area, and that Sergeant Lee "had to tell [Kalaola] at least maybe ten more times" to leave. Sergeant Lee also testified that there were other fights breaking out in the parking lot of ATM, with which he had to assist. He further testified that, when he came back to the front of ATM, "there were still other people fighting in the general area[,]" and that he again "asked [Kalaola] to leave and he wouldn't." Sergeant Lee testified that he then had Kalaola arrested for failure to disperse.

At the conclusion of the trial, the circuit court instructed the jury, with regard to the offense of failure to disperse, as follows:

. . .

A person commits the offense of Failure to Disperse if he is one of six or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm, or he is a person in the immediate vicinity, and he knowingly fails to comply with a law enforcement officer's order to disperse.

There are three material elements to the offense of Failure to Disperse, each of which the prosecution must prove beyond a reasonable doubt.

These elements are:

1. That, on or about the 19th day of May, 2007, in the City and County of Honolulu, State of Hawai'i, *[Kalaola] was one of six or more persons participating in a course of disorderly conduct* likely to cause substantial harm or serious inconvenience, annoyance or alarm, *or he was a person in the immediate vicinity* ; and

2. [Kalaola] failed to comply with a law enforcement officer's order to disperse; and

3. [Kalaola] did so knowingly.

(Emphasis added).

Although Kalaola requested that the circuit court include the statutory definition of "disorderly conduct" in the jury instructions, the circuit court did not instruct the jury on the definition of disorderly conduct.

The circuit court also gave the jury the following unanimity instruction, which was

based on *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996):

> The law allows the introduction of evidence for the purpose of showing that there is more than one act upon which proof of an element of an offense may be based. In order for the prosecution to prove an element, all twelve jurors must unanimously agree that the same act has been proved beyond a reasonable doubt.

During closing argument, the Deputy Prosecuting Attorney (DPA) referred to the *Arceo* instruction in arguing that there were multiple acts to support conviction. Specifically, the DPA relied on the instruction to argue that "both" the events on the first floor and the events on the second floor could support conviction:

> In order for the Prosecution to prove an element, all twelve jurors must unanimously agree that the same act has been proved beyond a reasonable doubt.
>
> What this means, ladies and gentlemen, is whenever there is more than one act upon which proof of an element may be based.
>
> *Basically, ladies and gentlemen, what that means is, number one, the incident on the second floor and, number two, the incident on the first floor.*
>
> The incident on the second floor is when [Kalaola] was engaging in—was calling people out and Officer Alapa told [Kalaola] to disperse and [Kalaola] did not so [sic].
>
> Officer Alapa chose not to arrest [Kalaola] at that time. He chose not to arrest anybody at that time because he was outnumbered and it was not safe for either him or Kaio to effectuate arrests.
>
> Their priority at that particular point was getting people—was to calm down the situation and getting people to leave the second floor.

> The second incident, this is the incident with Sergeant Lee downstairs.
>
> At that particular—and, ladies and gentlemen, that (inaudible) that *all twelve of you must agree that one of these incidents happened.*
>
> Basically, you cannot (inaudible) where six of you agree that the second floor incident happened, six of you agree that the first floor incident happened and [Kalaola] is guilty.
>
> What that means is that twelve of you must agree that the second floor incident happened or the first floor happened or both happened.
>
> Ladies and gentlemen, *both did happen in this case,* [Kalaola] failed to comply with Officer Alapa's orders to disperse on the second floor and he failed to comply with Sergeant Lee's orders to disperse on the first floor.[3]

(Emphasis added).

On April 18, 2008, the jury found Kalaola guilty on one count of failure to disperse. A timely appeal followed. In a May 29, 2009 Summary Disposition Order, the ICA concluded that the circuit court erred in (1) failing to properly instruct the jury on the statutory definition of "disorderly conduct" and (2) "failing to adequately instruct the jury that the 'knowingly' state of mind applied to all the elements of the offense." *State v. Kalaola,* No. 29163, 2009 WL 1507291, at *2 (Hawai'i App. May 29, 2009). The ICA further concluded that "there was sufficient evidence to establish each of the alternative means of committing the offense that was presented to the jury." *Id.* Finally, the ICA concluded that, assuming *arguendo* the case involved multiple acts, "the circuit court gave a specific unanimity instruction which obviated the need for an election" and

---

3. Similarly, defense counsel argued in closing that the purpose of the *Arceo* instruction was to ensure unanimity with regard to the alleged failure to disperse from the first floor versus the alleged failure to disperse from the second floor:

> I want to bring you back to Instruction No. 17, ... and that would be the instruction in which you must unanimously agree that the same act has been proven beyond a reasonable doubt. So I do want to highlight that there are several allegations of what happened and what transpired throughout the night, the early morning of May 19th.
>
> There's what supposedly happened on the second floor and there's supposedly what happened on the first floor. You all must unanimously agree to the exact incident in which Jason Kalaola allegedly failed to disperse and you've got to agree upon that beyond a reasonable doubt.

"there was sufficient evidence to prove that Kalaola engaged in conduct constituting the charged offense." *Id.* at *3. Accordingly, the ICA vacated the circuit court's April 18, 2008 judgment and remanded the case for a new trial. *Id.*

## II. Standards of Review

### A. Sufficiency of the Evidence

We review the sufficiency of evidence on appeal as follows:

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (quoting *State v. Quitog,* 85 Hawai'i 128, 145, 938 P.2d 559, 576 (1997)). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (citation omitted).

### B. Constitutional Questions

"We review questions of constitutional law *de novo,* under the right/wrong standard." *Jou v. Dai–Tokyo Royal State Ins. Co.,* 116 Hawai'i 159, 164–65, 172 P.3d 471, 476–77 (2007) (internal quotation marks and citation omitted).

## III. Discussion

### A. The prosecution presented substantial evidence that Kalaola failed to disperse from the first floor of ATM, but failed to present substantial evidence that Kalaola failed to disperse from the second floor of ATM

A person commits the offense of failure to disperse if he or she (1) was one of

"six or more persons [ ] participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm," *or* was "in the immediate vicinity" of such a disturbance; (2) was ordered by a law enforcement officer to disperse; (3) failed to comply with that order; and (4) acted knowingly with respect to the foregoing elements. HRS § 711–1102. Accordingly, the prosecution was required to prove the foregoing elements and state of mind beyond a reasonable doubt. *See State v. Assaye,* 121 Hawai'i 204, 216, 216 P.3d 1227, 1239 (2009) ("HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the state of mind required to establish each element of the offense.") (quoting *State v. Manewa,* 115 Hawai'i 343, 357–58, 167 P.3d 336, 350–51 (2007)).

In analyzing the evidence in this case, it is important to distinguish between "alternative means" and "multiple acts." In *State v. Jones,* 96 Hawai'i 161, 183–84, 29 P.3d 351, 373–74 (2001), this court explained that "we use the term 'alternative means' to describe the legal concept of *statutory* alternatives for proving a *single element* of the offense charged." 96 Hawai'i at 171 n. 14, 29 P.3d at 361 n. 14 (first emphasis in original; second emphasis added). Put another way, an alternative means case is one in which "a *single offense* may be committed in more than one way[.]" *Id.* at 170, 29 P.3d at 360 (emphasis added). Accordingly, the instant case is an "alternative means" case in the sense that "a single element" of the offense of failure to disperse "may be committed in more than one way," i.e., where the defendant is one of six or more persons participating in a course of disorderly conduct, *or* where the defendant is in the "immediate vicinity" of such a disturbance.

This is also a "multiple acts" case.[4] "Multiple acts" refer to *"separate and dis-*

---

4. On appeal, the State argued that "[Kalaola] was engaged in a single violation of the statute through a continuing course of conduct comprising failure to disperse in its totality[.]" However-

er, in its closing argument, the State argued that Kalaola's failure to disperse from either floor was independently sufficient to support a conviction. Thus, the State did not argue that Kalaola

*tinct culpable acts* that could support *separate counts* of an indictment or complaint[,]" but that are submitted to the jury in a single count. *Jones*, 96 Hawai'i at 169, 29 P.3d at 359 (emphasis added). Thus, in multiple acts cases, "[e]ach 'separate and distinct culpable act' or 'independent incident' that may be charged as a separate count includes the conduct, attendant circumstances, and result of conduct that may be present." *Id.* at 171, 29 P.3d at 361.

The distinct multiple acts here are: (1) Kalaola's alleged failure to leave the second floor of ATM after being ordered to do so by Officer Alapa, and (2) Kalaola's alleged failure to leave the first floor after being ordered to do so by Sergeant Lee. In sum, the jury was presented with two acts, i.e., the alleged failures to disperse on the second and first floors of ATM, either of which could have been committed via two statutory alternative means, i.e., participating in disorderly conduct or being in the vicinity of disorderly conduct.

■ With this framework as a background, we will evaluate the sufficiency of the evidence with regard to each floor. First, we conclude that there was insufficient evidence that Kalaola violated HRS § 711–1102 by failing to disperse from the second floor of ATM. Officer Alapa did not testify concerning how long Kalaola remained on the second floor after Officer Alapa ordered the crowd to disperse, other than observing that he saw Kalaola again on the first floor at least 20 minutes later. Kalaola's presence on the first floor at least 20 minutes later indicates that Kalaola complied with Officer Alapa's order to disperse. Accordingly, there is not substantial evidence that Kalaola knowingly failed to comply with Officer Alapa's

order to disperse on the second floor of ATM.[5]

■ However, there was sufficient evidence that Kalaola violated HRS § 711–1102 by failing to disperse from the first floor of ATM. First, there was substantial evidence as to both of the statutory alternative means, i.e., that Kalaola was one of "six or more persons [ ] participating in a course of disorderly conduct" or that he was in the "immediate vicinity" of such a disturbance. *See* HRS § 711–1102(1). Sergeant Lee testified that he saw "about 50" people "streaming out" of ATM, with "some small fights breaking out[,]" and that he saw Kalaola "streaming out" of the second floor, yelling and swearing. Sergeant Lee further testified that, when he approached Kalaola on the first floor, Kalaola was yelling and cursing at other people, and that "there were still other people fighting in the general area[.]" When viewed in the light most favorable to the prosecution, Sergeant Lee's testimony is sufficient to enable a person of reasonable caution to support a conclusion that "six or more persons [were] participating in a course of disorderly conduct," and that Kalaola was either "participating" in such conduct or in the "immediate vicinity." *See* HRS § 711–1102.

Second, there is substantial evidence that Sergeant Lee ordered Kalaola to disperse. Sergeant Lee testified that he approached Kalaola and "told him to leave the area." He further testified that he "had to tell [Kalaola] at least maybe ten more times" to leave. Accordingly, when viewed in the light most favorable to the prosecution, Sergeant Lee's testimony provides substantial evidence that Kalaola was ordered to disperse. *See In re Doe*, 95 Hawai'i 183, 196, 20 P.3d 616, 629 (2001) (citation omitted) (noting that "the

had engaged in a continuing course of conduct constituting failure to disperse, but rather argued that either of two separate incidents, "number one, the incident on the second floor and, number two, the incident on the first floor[,]" could support a conviction. Accordingly, because the State argued this as a multiple acts case, we do not consider whether Kalaola's alleged failure to disperse could constitute a continuing course of conduct.

5. Each element of the offense must be proved beyond a reasonable doubt. HRS § 701–114(1)(a). Because we conclude that there was insufficient evidence that Kalaola knowingly failed to comply with Officer Alapa's order to disperse on the second floor, we need not address whether there was sufficient evidence concerning each of the remaining elements as to the second floor, including whether there was sufficient evidence of each of the statutory alternative means.

testimony of a single witness, if found by the trier of fact to have been credible, will suffice" to provide substantial evidence).

Third, there is substantial evidence that Kalaola failed to comply with Sergeant Lee's order, because Sergeant Lee testified that he "had to tell [Kalaola] at least maybe ten more times" to leave, and that he "asked [Kalaola] to leave and he wouldn't." Accordingly, Sergeant Lee's testimony provides substantial evidence that Kalaola failed to leave when ordered to do so, i.e., that he failed to comply with Sergeant Lee's order to disperse. *See id.*

█ Finally, there is substantial evidence that Kalaola acted knowingly with respect to the foregoing elements. "[T]he mind of an alleged offender may be read from his or her acts or conduct and the inferences fairly drawn from all of the circumstances." *State v. Pudiquet,* 82 Hawai'i 419, 425, 922 P.2d 1032, 1038 (1996) (internal quotation marks omitted) (quoting *State v. Leung,* 79 Hawai'i 538, 544, 904 P.2d 552, 558 (App.1995)). In the instant case, Sergeant Lee testified that he approached Kalaola and "told him to leave the area," but that Kalaola refused. Thus, an inference may be fairly drawn from Sergeant Lee's testimony that Kalaola both knew of the order to disperse, and knowingly failed to comply with it.

Accordingly, there is substantial evidence that Kalaola failed to disperse from the first floor of ATM.

**B. Double jeopardy does not bar retrial of Kalaola**

The remaining question is whether Kalaola can be retried in these circumstances. Ka-

laola initially suggested, in his opening brief to the ICA, that he could be retried on the "alternative theor[y]" that was supported by sufficient evidence. However, during oral argument in this court, Kalaola suggested double jeopardy could bar retrial.[6] In view of the fact that this issue was eventually raised by Kalaola and is discussed at length by the dissent, we address it to provide guidance to the circuit court. As set forth below, we conclude that double jeopardy does not bar retrial with regard to Kalaola's failure to disperse from the first floor, for which there was clearly sufficient evidence adduced to support a conviction.

**1. Double jeopardy principles**

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" Similarly, article I, section 10 of the Hawai'i Constitution provides that no person "shall ... be subject for the same offense to be twice put in jeopardy[.]"

This court has "described the purpose underlying the prohibition against double jeopardy" as follows:

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to

---

6. The question of whether double jeopardy precludes Kalaola's retrial was not raised by Kalaola in his briefs to the ICA or application to this court. To the contrary, after arguing in his opening brief that there was insufficient evidence to support the conviction in its entirety, Kalaola then argued:

> Even if, however, the State adduced sufficient evidence for one of the alternative theories, it is impossible to determine which alternative theory the jury based its verdict upon because the circuit court did not provide an interrogatory to the jury. Based on the nature of the evidence and the arguments in the case, it is probable that the jurors based their decision on an alternative that was not supported by

sufficient evidence. As such, Kalaola's rights to a unanimous verdict and due process under article I, § 5 of the Hawaii State Constitution have been violated and *Kalaola's conviction must remanded [sic] for trial on the viable alternative.*

Kalaola's counsel repeated that suggestion in his opening argument to this court, MP3: Oral Argument, Hawaii Supreme Court, at 27:55–28:19, 29:58–30:20 (Jan. 7, 2010), *available at* http://www.courts.state.hi.us/courts/oral_ arguments/archive/oasc29163.html, a position with which the State agreed, *id.* at 48:51–49:14. It was not until defense counsel's rebuttal closing that counsel suggested there might be a double jeopardy issue. *Id.* at 59:04–1:00:17.

live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*State v. Quitog,* 85 Hawai'i 128, 140, 938 P.2d 559, 571 (1997) (quotation marks omitted) (quoting *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)).

This court has also "recognized that there are three separate and distinct aspects to the protections offered by the double jeopardy clause." *Id.* at 141, 938 P.2d at 572. Thus, "[d]ouble jeopardy protects individuals against: (1) *a second prosecution for the same offense after acquittal;* (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *Id.* (citations and quotation marks omitted; emphasis added); *see also Whiting v. State,* 88 Hawai'i 356, 359, 966 P.2d 1082, 1085 (1998). Consistent with the prohibition against reprosecution following an acquittal, double jeopardy presents an absolute bar to retrial where, inter alia, the defendant "has been acquitted, whether expressly or impliedly, notwithstanding a subsequent reversal of the judgment on appeal[,]" *State v. Feliciano,* 62 Haw. 637, 644, 618 P.2d 306, 311 (1980), *superseded by statute on other grounds as stated in State v. Rumbawa,* 94 Hawai'i 513, 517, 17 P.3d 862, 866 (App.2001), and where "the insufficiency of evidence is such that the appellate court finds that the government failed to prove its case beyond a reasonable doubt[,]" *State v. Bannister,* 60 Haw. 658, 660, 594 P.2d 133, 135 (1979) (quoting *Burks v. United States,* 437 U.S. 1, 16 n. 10, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).

However, "the protections of the double jeopardy clause are not absolute." *State v. Miyazaki,* 64 Haw. 611, 618, 645 P.2d 1340, 1345 (1982); *see also United States v. Tateo,* 377 U.S. 463, 466, 84 S.Ct.

1587, 12 L.Ed.2d 448 (1964) ("Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he [has] obtained such a trial. It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.").[7] For example, "[t]he double jeopardy clause does not preclude retrial where a defendant was not acquitted of the charged offense[,]" *Whiting,* 88 Hawai'i at 359, 966 P.2d at 1085, and "imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside[,]" for reasons other than insufficiency of the evidence, *State v. Jess,* 117 Hawai'i 381, 439 n. 28, 184 P.3d 133, 191 n. 28 (2008) (quotation marks omitted) (quoting *United States v. DiFrancesco,* 449 U.S. 117, 131, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980)). As set forth below, such reasons are typically referred to as "trial error." *See, e.g., Burks,* 437 U.S. at 14–15 & n. 8, 98 S.Ct. 2141. (noting that reversal for trial error "is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct").

In the instant case, we conclude that the lack of substantial evidence concerning Kalaola's failure to disperse from the second floor of ATM does not bar remand with regard to Kalaola's failure to disperse from the first floor of ATM, for which there clearly was sufficient evidence adduced at trial.

**2. The jury neither expressly nor impliedly acquitted Kalaola of the charged offense**

It is clear that "a defendant may not be retried for any offense of which he has

---

7. The dissent correctly observes that "federal precedents set forth minimum protections, and do not control the state constitution[.]" Dissenting opinion at 84, 237 P.3d at 1150. However, this court has cited with approval the principles derived from each of the federal cases relied upon herein. *See, e.g., State v. Hamala,* 73 Haw. 289, 293, 834 P.2d 275, 277 (1992) (quoting

*Tateo,* 377 U.S. at 466, 84 S.Ct. 1587), *overruled on other grounds by State v. Rogan,* 91 Hawai'i 405, 984 P.2d 1231 (1999); *Feliciano,* 62 Haw. at 644, 618 P.2d at 311 (citing *Green v. United States,* 355 U.S. 184, 190–91, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)); *Bannister,* 60 Haw. at 660, 594 P.2d at 135 (quoting *Burks,* 437 U.S. at 16 n. 10, 98 S.Ct. 2141).

been acquitted, whether expressly or impliedly, notwithstanding a subsequent reversal of the judgment on appeal." *Feliciano*, 62 Haw. at 644, 618 P.2d at 311; *see also State v. Mundon*, 121 Hawai'i 339, 355, 219 P.3d 1126, 1142 (2009) ("That a jury's verdict of acquittal bars a subsequent retrial on those same offenses is 'perhaps the most fundamental rule in the history of double jeopardy jurisprudence.'") (citation and some quotation marks omitted). In a case involving reversal of a conviction on a lesser included offense, this court has explained that two rationales support the prohibition against reprosecution following an acquittal:

First, the concept of double jeopardy is enhanced in that after an acquittal, *a defendant is freed of the threat of renewed prosecution on the more serious offense*.... Second, *such a rule does not inhibit a defendant in his decision of whether to appeal his conviction.* The Commentary to HRS [§ ] 701–110[ [8] ] states, "If the defendant faces reprosecution for an offense of which he has been acquitted, he may be unfairly hampered in his decision about whether to contest the validity of the conviction for the lesser offense." Under the rule we discuss today, the appellant would not be coerced into waiving his right to appeal his conviction on the lesser included offense for fear of being reprosecuted on the more serious offense.

*Feliciano*, 62 Haw. at 644, 618 P.2d at 311 (emphasis added).

In the instant case, however, there was no express jury verdict of acquittal. Kalaola was charged with one count of failure to disperse in violation of HRS § 711–1102(1), and was convicted on that count. Although the prosecution argued that Kalaola committed two distinct acts of failing to disperse, the

jury did not return an express verdict of acquittal with regard to either act. Moreover, as discussed further *infra*, the jury's guilty verdict did not impliedly acquit Kalaola with regard to his alleged failure to disperse from either floor.

In *Green v. United States*, 355 U.S. 184, 190–91, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), which this court cited with approval in, inter alia, *Feliciano, see* 62 Haw. at 644, 618 P.2d at 311, the United States Supreme Court explained that, in certain circumstances, a conviction on a lesser-included crime must, for double jeopardy purposes, be taken as an implied acquittal of the greater charge. Consistent with that holding, this court has concluded that "a defendant who has been convicted of a lesser included offense than that charged is deemed to have been acquitted of the greater charge." *Feliciano*, 62 Haw. at 644, 618 P.2d at 311; *see also State v. Pesentheiner*, 95 Hawai'i 290, 301, 22 P.3d 86, 97 (App.2001) (noting that "a criminal defendant is protected from being retried for an offense whenever a jury 'impliedly acquits' him of that offense by finding him guilty of a lesser included offense").

In *Green*, the defendant was indicted on two counts, one of which charged that he had committed arson, and one of which charged him with murder in the first degree. 355 U.S. at 185, 78 S.Ct. 221. A jury found the defendant guilty of arson and of the lesser-included offense of second degree murder. *Id.* at 186, 78 S.Ct. 221. The jury "did not find [the defendant] guilty on the charge of murder in the first degree[,]" and "[i]ts verdict was silent on that charge." *Id.* On appeal, the District of Columbia Circuit Court of Appeals reversed the conviction for second degree murder because it was not supported by sufficient evidence, and the case was remanded for a new trial. *Id.*

---

8. HRS § 701–110 (1993) provides, in pertinent part:

**When prosecution is barred by former prosecution for the same offense.** When a prosecution is for an offense under the same statutory provision and is based on the same facts as a former prosecution, it is barred by the former prosecution under any of the following circumstances:

(1) The former prosecution resulted in an acquittal which has not subsequently been

set aside. There is an acquittal if the prosecution resulted in a finding of not guilty by the trier of fact or in a determination by the court that there was insufficient evidence to warrant a conviction. A finding of guilty of a lesser included offense is an acquittal of the greater inclusive offense, although the conviction is subsequently set aside on appeal by the defendant.

...

On remand, the defendant was "tried again for first degree murder under the original indictment." *Id.* He raised the defense of former jeopardy, "based [not] on his previous conviction for second degree murder but instead on the original jury's refusal to convict him of first degree murder." *Id.* at 186, 190 n. 11, 78 S.Ct. 221. The defendant's double jeopardy defense was rejected by the trial court, and "a new jury found [the defendant] guilty of first degree murder[.]" *Id.* at 186, 78 S.Ct. 221. On appeal, the Court of Appeals "rejected his defense of former jeopardy . . . and affirmed the conviction." *Id.* The United States Supreme Court granted certiorari, *id.,* and "conclude[d] that this second trial for first degree murder placed [the defendant] in jeopardy twice for the same offense in violation of the Constitution[,]" *id.* at 190, 78 S.Ct. 221.

In so doing, the Court noted that "[a]t [the defendant's] first trial the jury was authorized to find him guilty of either first degree murder . . . or, *alternatively,* of second degree murder. . . ." *Id.* at 189–90, 78 S.Ct. 221 (emphasis added). The Court concluded that, "[i]n substance the situation was the same as though [the defendant] had been charged with these different offenses in separate but alternative counts of the indictment. The constitutional issues at stake here should not turn on the fact that both offenses were charged to the jury under one count." *Id.* at 190 n. 10, 78 S.Ct. 221. The Court explained that:

[The defendant] was in direct peril of being convicted and punished for first degree murder at his first trial. He was forced to run the gauntlet once on that charge and *the jury refused to convict him. When given the choice between finding him guilty of either first or second degree murder it chose the latter.* In this situation the great majority of cases in this country have regarded the jury's verdict as an implicit acquittal on the charge of first degree murder. . . . In brief, we believe this case can be treated no differently, for purposes of former jeopardy, than if the jury had returned a verdict which expressly read: 'We find the defendant not guilty

of murder in the first degree but guilty of murder in the second degree.'

*Id.* at 190–91, 78 S.Ct. 221 (emphasis added).

Similarly, in *Feliciano,* the defendant was charged with attempted murder, and was found guilty of reckless endangering in the second degree. 62 Haw. at 637–38, 618 P.2d at 307. This court concluded that the conviction for reckless endangering resulted from an erroneous jury instruction, and reversed. *Id.* at 638, 618 P.2d at 308. We further held that "retrial on the attempted murder charge [was] barred by HRS [§ ] 701–110." *Id.* This court noted that "[t]he jury conviction in the first trial on the lesser included offense *automatically acquitted* the appellant of the greater charge in the indictment and retrial on the greater offense is barred." *Id.* at 644, 618 P.2d at 311 (emphasis added).

Thus, the doctrine of implied acquittals has developed primarily in the context of reviewing convictions on lesser-included offenses. *See id.; see also State v. Loa,* 83 Hawai'i 335, 361, 926 P.2d 1258, 1284 (1996) (noting, where the circuit court instructed the jury on a non-existent lesser-included offense, "[t]he jury having acquitted [the defendant] of [the] charge[d offense] by virtue of its verdict [of guilt on the lesser-included offense], we hold that [the defendant] may not be retried for it."). The ICA has declined to extend the doctrine of implied acquittals to other contexts. In *State v. Pesentheiner,* 95 Hawai'i 290, 291, 22 P.3d 86, 87 (App.2001), *cert. denied* May 4, 2001 (no Westlaw citation available; *available at* http://www.state.hi.us/jud/opdate2001.htm), the defendant was charged with harassment, which required that he have acted "with the intent to harass, annoy, or alarm any other person[.]" The district court, in a bench trial, found the defendant guilty as charged, but determined that the defendant's actions were "reckless." *Id.* The ICA determined that the district court's ruling "demonstrates its genuine confusion as to the intent element of the harassment charge[,]" and therefore concluded that the conviction could not stand. *Id.* at 301, 22 P.3d at 97.

The defendant urged that his conviction should be reversed. In considering whether double jeopardy would bar reprosecution of

the defendant on the theory that the district court had acquitted him of the harassment charge by not finding the requisite state of mind, the ICA explained:

> [A]ny [ ] implication in this case that the court made a finding of fact inconsistent with guilt must founder. The court's erroneous assumption that recklessness was sufficient for conviction rendered it unnecessary, under the assumption, to go further in considering the evidence than a finding that [the defendant] recklessly waved his arms. Had the court applied the correct *mens rea* standard in its consideration of the evidence, it would have been further required to assess the weight and credibility of [the police officer's] description of the *actus reus*. As we have observed, the court's ruling is devoid of any mention of the issue. *Under these circumstances, we cannot say that the court made a definitive finding of fact, invariably inconsistent with guilt, that might bar retrial.*
>
> Instead, having concluded that sufficient evidence was adduced at trial to sustain the charge, we apply the usual rule for trial error[.]

*Id.* (some emphasis in original and some added).

There are strong policy reasons in favor of requiring that the trier of fact make some determination in a defendant's favor before a reviewing court will presume an acquittal. In addressing criticism that reversal for trial error may make it "quite possible that the jury would have acquitted [the defendant] if not for the trial error that required reversal," it has been noted that:

> while estimating the impact of a trial error always presents uncertainties, whether the result is a conviction or an acquittal, *only in the latter situation is there concrete evidence, in the form of a not guilty verdict, that the jury may have resolved fac-* *tual issues in favor of the defendant's innocence.* That concrete evidence entitles the defendant to the benefit of the doubt that conclusively presumes his innocence, *while a conviction, even where probably influenced by trial error, offers no such starting point for assuming the jurors would have found defendant not guilty except for the error.*

Wayne R. LaFave, et al., *Criminal Procedure* § 25.3(b) at 631–32 (3d ed.2007) (emphasis added).

In the instant case, as explained *supra*, Kalaola was not expressly acquitted by the jury. Moreover, Kalaola's conviction on the charge of failure to disperse cannot be assumed to include an implied acquittal on either of the acts offered by the prosecution to support his conviction. Kalaola was not convicted on a lesser-included offense, such that his conviction must be interpreted as an implied acquittal on the greater charge. *See Green*, 355 U.S. at 190–91, 78 S.Ct. 221; *Feliciano*, 62 Haw. at 643–44, 618 P.2d at 311. In addition, the jury did not refuse to convict Kalaola on the basis of either act, nor was the jury required to choose between the act on the first floor and the act on the second floor in order to convict, such that a conviction on one must be interpreted as an implied acquittal on the other. *See Green*, 355 U.S. at 190–91, 78 S.Ct. 221. Finally, there is no indication that the jury "made a definitive finding of fact, invariably inconsistent with guilt, that might bar retrial." *See Pesentheiner*, 95 Hawai‘i at 301, 22 P.3d at 97. Accordingly, the purposes underlying the double jeopardy prohibition against retrial following acquittal, i.e., avoiding the threat of renewed prosecution and a chilling effect on the decision to appeal, are not implicated in the circumstances of this case. *See Feliciano*, 62 Haw. at 644, 618 P.2d at 311. Based on the foregoing, cases concerning implied acquittals are plainly inapposite.[9]

> Although, the dissent speculates that "it is *possible* that [Kalaola] could be retried for conduct the jury had rejected as a basis for legal liability in the first trial[,]" since "[i]t is impossible to know for which multiple acts the jury convicted [Kalaola]," dissenting opinion at 79, 237 P.3d at

---

9. We therefore agree with the dissent's conclusion that the holdings in *Feliciano*, *Whiting* and *Loa* are inapposite, dissenting opinion at 86–87, 237 P.3d at 1152–53, insofar as they concerned implied acquittals in the context of lesser-included offenses. However, this conclusion supports the inference that the doctrine of implied acquittals does not extend to the circumstances of the instant case.

*State v. Mundon,* 121 Hawai'i 339, 219 P.3d 1126 (2009) is not to the contrary. Mundon was charged with, inter alia, two counts of terroristic threatening in the first degree (TT1). *Id.* at 354, 219 P.3d at 1141. The language of the indictment as to each count was identical, and the prosecution adduced evidence as to two separate acts of TT1 at trial. *Id.* However, "each specific act was not assigned to a specific count[.]" *Id.* at 355, 219 P.3d at 1142. The jury "convicted Mundon of one count of TT1 and *acquitted him of the other.*" *Id.* at 354, 219 P.3d at 1141 (emphasis added).

This court noted that, because no specific unanimity instruction was given, "there is a 'genuine possibility' that different jurors concluded that Mundon committed different acts." *Id.* Accordingly, this court held that "the trial court plainly erred in failing to provide such an instruction." *Id.* at 355, 219 P.3d at 1142. This court further noted that "Mundon's conviction on one of the TT1 counts and *acquittal on another* (where the specific act supporting each count was never specified) raises double jeopardy concerns." *Id.* (emphasis added). Even assuming that the jury was unanimous as to which of the two alleged acts formed the basis for Mundon's culpable conduct, *"there [was] no way to know which specific act ... served as the basis for Mundon's acquittal[.]"* *Id.* (emphasis in original). Accordingly, if this court had remanded one of the counts for retrial, there would be "a distinct possibility that Mundon could be retried for an offense involving the same conduct for which he was acquitted." *Id.* Since it is well-settled that double jeopardy bars retrial for the same offense after an express acquittal, this court reversed Mundon's conviction. *Id.*

In contrast, in the instant case, Kalaola was never acquitted by a jury for either of the two alleged acts of failure to disperse. Thus, unlike *Mundon,* the retrial of Kalaola does not present a distinct possibility that Kalaola could be retried for an offense for which he was previously acquitted. Moreover, whereas the holding in *Mundon* relies on the well-established proposition that double jeopardy bars retrial following an express jury verdict of acquittal, nothing in *Mundon* purports to resolve the distinct factual situation presented here, where the jury expressly found the defendant guilty of the charged offense.

### 3. There was sufficient evidence to support Kalaola's conviction for failure to disperse

■ The reversal of a conviction for insufficiency of the evidence constitutes a determination by the appellate court that the defendant should have been acquitted in the trial court in the first instance because, "as a matter of law [ ] the jury could not properly have returned a verdict of guilty." *See State v. Bannister,* 60 Haw. 658, 660, 594 P.2d 133, 135 (1979). When reviewing the sufficiency of evidence presented at trial, this court has explained that:

> evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but *whether there was substantial evidence to support the conclusion of the trier of fact.*

*Jones,* 96 Hawai'i at 181, 29 P.3d at 371 (emphasis added) (quoting *Quitog,* 85 Hawai'i at 145, 938 P.2d at 576).

■ In the instant case, the evidence presented at trial was insufficient to support a conclusion that Kalaola failed to disperse from the second floor of ATM when ordered to do so by Officer Alapa. However, this evidentiary insufficiency does not bar retrial of Kalaola on his alleged failure to disperse

---

1145 (emphasis added), such speculation is insufficient to implicate the protections of the double jeopardy clause. Nevertheless, the dissent suggests that remand is impermissible because "it is [ ] entirely possible that the jury had in effect found [Kalaola] not guilty on the act[ ] supported by substantial evidence." Dissenting opinion at

89, 237 P.3d at 1155. With all due respect, the dissent's extension of the implied acquittal doctrine to the circumstances of the instant case—in which there is no basis for assuming that the jury "in effect" acquitted Kalaola of the charged offense—is without support in our case law.

from the first floor, for which there was clearly sufficient evidence. Because there was "substantial evidence to support the conclusion of the trier of fact," i.e., that Kalaola was guilty of the charged offense of failure to disperse, double jeopardy does not bar retrial with regard to the events on the first floor. *See id.*

In *Burks v. United States,* 437 U.S. 1, 5, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), the United States Supreme Court considered "whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury." The Court analogized an appellate court's determination that the evidence was insufficient to support a conviction to a verdict of acquittal, noting:

It is unquestionably true that the Court of Appeals' decision "represente[d] a resolution, correct or not, of some or all of the factual elements of the offense charged." By deciding that the Government had failed to come forward with sufficient proof of petitioner's capacity to be responsible for criminal acts, that court was clearly saying that Burks' criminal culpability had not been established. If the District Court had so held in the first instance, as the *reviewing* court said it should have done, a judgment of acquittal would have been entered and, of course, petitioner could not be retried for the same offense. Consequently, as Mr. Justice Douglas correctly perceived in *Sapir* [*v. United States,* 348 U.S. 373, 75 S.Ct. 422, 99 L.Ed. 426 (1955) ], it should make no difference that the reviewing court, rather than the trial court, determined the evidence to be insufficient. *The appellate decision unmistakably meant that the District Court had erred in failing to grant a judgment of acquittal.* To hold otherwise would create a purely arbitrary distinction between those in petitioner's position and others who would enjoy the benefit of a correct decision by the District Court.

*Id.* at 10–11, 98 S.Ct. 2141 (internal citations and footnote omitted; some brackets in original and some added; first emphasis in original, second emphasis added).

The Court further explained that "[t]he [d]ouble [j]eopardy [c]lause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Id.* at 11, 98 S.Ct. 2141. The Court also distinguished reversal for evidentiary insufficiency from that for trial error:

In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, *it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect,* e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

*Id.* at 15, 98 S.Ct. 2141 (emphasis added).

The court identified, inter alia, "the failure to dismiss a faulty indictment[,]" "improper instruction," "absence of the accused during a portion of the trial," "improper hearsay testimony received," and "failure to record jury instructions," as trial errors. *Id.* at 14 & n. 8, 98 S.Ct. 2141.

Relying on *Burks,* this court has determined that "[t]he prohibition against double jeopardy applies where the reversal is based on insufficiency of evidence[.]" *Bannister,* 60 Haw. at 660, 594 P.2d at 135. In *Bannister,* this court reversed the defendant's conviction for first degree theft due to a lack of admissible evidence that he had committed theft of "property or services the value of which exceeds $200[,]" and remanded for entry of a judgment of acquittal. *Id.* at 659–60, 594 P.2d at 134–35 (quotation marks omitted). This court explained that:

Since we necessarily afford absolute finality to a jury's verdict of acquittal no matter how erroneous its decision it is difficult to conceive how society has any greater interest in retrying the defendant when, on review, it is decided as a

58

matter of law that the jury could not properly have returned a verdict of guilty.

[*Burks*, 437 U.S. at] 16[ , 98 S.Ct. 2141]. However, the prohibition does not apply where judgment is reversed for a trial error because the *effect of the decision does not constitute a failure of the government to prove its case. Id.* at 10[ , 98 S.Ct. 2141].

The prohibition against double jeopardy where reversal is based on insufficiency of evidence is absolute. The appellate court cannot remand the case even where a new trial appears equitable. *Id.* at 11 n. 6[ , 98 S.Ct. 2141]. Furthermore, *this prohibition applies only where the insufficiency of evidence is such that the appellate court finds that the government failed to prove its case beyond a reasonable doubt. Id.* at 16 n. 10[ , 98 S.Ct. 2141].

*Id.* at 660, 594 P.2d at 135 (emphasis added); *see also State v. Hamala,* 73 Haw. 289, 293, 834 P.2d 275, 277 (1992), *overruled on other grounds by State v. Rogan,* 91 Hawai'i 405, 984 P.2d 1231 (1999).

In the instant case, there was substantial evidence that Kalaola failed to disperse on the first floor. Thus, the determination that there was not substantial evidence that Kalaola failed to disperse on the second floor "does not constitute a failure of the government to prove its case." *See Bannister,* 60 Haw. at 660, 594 P.2d at 135. To the contrary, our conclusion demonstrates that there was "substantial evidence to support the conclusion of the trier of fact[,]" i.e., that Kalaola was guilty of the charged offense of failure to disperse. *See Jones,* 96 Hawai'i at 181, 29 P.3d at 371. Moreover, our determination that there was insufficient evidence that Kalaola failed to disperse on the second floor does not constitute a determination that Kalaola should have been acquitted in the trial court, since the jury could properly have returned a verdict of guilty on the charged offense based on the events that took place on the first floor. Our determination therefore "implies nothing with respect to the guilt or innocence of [Kalaola]" with regard to the charged offense of failure to disperse. *See Burks,* 437 U.S. at 15, 98 S.Ct. 2141.

This analysis is consistent with our holding in *Jones,* 96 Hawai'i at 183–84, 29 P.3d at 373–74. The defendant in *Jones* was charged with multiple counts of sexual assault relating to the 14 year old complaining witness (CW). 96 Hawai'i at 163–64, 29 P.3d at 353–54. Each count related to a specific act of sexual penetration or sexual contact; in other words, the State did not rely on multiple acts of sexual conduct to support a single count, and thus *Jones* was not a "multiple acts" case. *Id.* at 172, 29 P.3d at 362. However, the State did rely on alternative means of proving the consent element of each offense, i.e., it argued both that the CW did not consent, and that if she did, her consent was invalid for various reasons. *Id.* at 164, 174, 29 P.3d at 354, 364. The circuit court instructed the jury both on lack of consent, and on four different grounds by which it could find that any consent by the CW was invalid, pursuant to HRS § 702–235. *Id.* at 164–65, 29 P.3d at 354–55. Although the prosecution presented "considerable argument and some evidence" regarding two of the four grounds, this court found that there was insufficient evidence supporting any of the four grounds. *Id.* at 183, 29 P.3d at 373. There was, however, sufficient evidence to establish lack of consent by the CW. *Id.* at 182, 29 P.3d at 372.

We then phrased the issue as follows: "in an alternative means case where it is impossible to tell which alternative the jury's verdict is based upon, does due process require that each of the alternative means presented to the jury be supported by legally sufficient evidence?" *Id.* at 178, 29 P.3d at 368. We considered, but rejected, the approach taken by the United States Supreme Court in *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), where the Court held that due process did not require that each alternative presented to the jury be supported by sufficient evidence, since it could be assumed that the jury had rejected any alternative that was not so supported. *Id.* at 178–81, 29 P.3d at 368–71. We concluded that "unanimity is not required where alternative means of establishing an element of an offense are submitted to the jury, *provided that* there is no reasonable possibility

that the jury's verdict was based on an alternative unsupported by sufficient evidence." *Id.* at 181, 29 P.3d at 371 (emphasis in original).

We emphasized that the trial court had instructed the jury that it could find that the consent element was satisfied if any one of four alternative theories of ineffective consent was established by the State, and observed that based on that instruction being given, "the jurors understandably might believe that there must be some evidence to support that theory." *Id.* at 183, 29 P.3d at 373 (quoting *Commonwealth v. Plunkett*, 422 Mass. 634, 664 N.E.2d 833, 837 (1996)). We also noted that "there was *some* evidence and argument to the jury supporting some of the grounds of ineffective consent[,]" *Jones,* 96 Hawai'i at 167, 178, 29 P.3d at 357, 368 (emphasis in original), but that "the evidence adduced in support of those grounds was legally insufficient[,]" *id.* at 178, 29 P.3d at 368. Thus, we concluded that "the instruction as to ineffective consent prejudicially affected Defendant's right to due process[,]" and added that "the erroneous jury instruction regarding ineffective consent was not harmless because there was a reasonable possibility that the verdict was based on an alternative that was unsupported by legally sufficient evidence." *Id.*

In sum, this court determined that: (1) the jury was instructed that it could convict Defendant based on the absence of consent *or* any of the four grounds of ineffective consent, (2) there was a reasonable possibility that the verdict was based upon at least one of the four grounds of ineffective consent, and (3) *there was legally insufficient evidence to support any of the four grounds of ineffective consent presented to the jury.*

*Id.* (first emphasis in original, second emphasis added).

Accordingly, we determined that the defendant's conviction could not stand. *Id.* However, despite determining that there was a "possibility that the verdict was based on an alternative means of establishing guilt not supported by legally sufficient evidence," this court concluded that "the double jeopardy clause does not bar retrial on the means of establishing guilt for which there was sufficient evidence presented at trial" because "the error in this case was trial error." *Id.* at 184 n. 30, 29 P.3d at 374 n. 30.

 It is well-settled that, even where this court finds trial error, "challenges to the sufficiency of the evidence must always be decided on appeal. This is because 'the [d]ouble [j]eopardy [c]lause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction.'" *State v. Malufau,* 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995), *vacated in part on other grounds on reconsideration,* 80 Hawai'i 126, 134–38, 906 P.2d 612, 620–24 (1995). Although this court determined that there was trial error in *Jones,* double jeopardy would have barred retrial had this court found that "the evidence at trial [was] legally insufficient to support a conviction." *Jones* 96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30. Thus, *Jones* is not distinguishable on the ground that the outcome was based on trial error.[10]

A careful reading of this court's discussion of double jeopardy in *Jones* is instructive:

10. The dissent maintains that "the instant case *hinges on* the prosecution's failure to adduce sufficient evidence, and not on the court's failure to properly instruct the jury." Dissenting opinion at 81, 237 P.3d at 1147 (emphasis added). The dissent further asserts that "because the basis for reversal [in *Jones* ] was 'trial error' and not insufficiency of the evidence, double jeopardy was not implicated[.]" Dissenting opinion at 81, 237 P.3d at 1147.

However, the instant case does not "hinge on" insufficiency of the evidence to any greater extent than *Jones.* It is undisputed that trial error occurred in the instant case, insofar as the cir-

cuit court failed to properly instruct the jury. Although the dissent attempts to discount the presence of trial error in this case by apparently contending that the disposition in *Jones* is proper only where insufficiency of the evidence occurs as a direct result of trial error, dissenting opinion at 83, 237 P.3d at 1149, nothing in this court's analysis in *Jones* requires such a result. Moreover, the dissent does not explain why requiring a nexus between trial error and insufficiency of the evidence is necessary in light of the principle that, so long as there was sufficient evidence presented to support a conviction, double jeopardy bars retrial only when there was an acquittal, whether express or implied.

The double jeopardy clause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction. However, retrial is not barred when the reviewing court reverses a case due to trial error, such as erroneous jury instructions. Although our holding in this case is based, in part, on our conclusion that the jury instruction regarding ineffective consent raised the possibility that the verdict was based on an alternative means of establishing guilt not supported by legally sufficient evidence, it is undisputed that there was legally sufficient evidence of the other alternative of establishing guilt and, *thus*, the error in this case is trial error. Accordingly, the double jeopardy clause does not bar retrial on the means of establishing guilt for which there was sufficient evidence presented at trial.

*Id.* at 184 n. 30, 29 P.3d at 374 n. 30 (citations omitted) (emphasis added).

This court's reasoning indicates that because there was sufficient evidence of one of the alternative means of establishing guilt but insufficient evidence of the other, the error in *Jones* was properly analyzed under the double jeopardy principles applicable to trial error. Put another way, the double jeopardy clause was not implicated because there was sufficient evidence "to support a conviction." [11] *Id.; see also Arceo*, 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40. Similarly here, the double jeopardy clause is not implicated with regard to Kalaola's failure to disperse from the first floor of ATM since there was sufficient evidence to support a conviction based on those acts.

**11.** We respectfully disagree with the dissent's attempt to distinguish *Jones* on the ground that, in *Jones*, the prosecution charged each act or incident in a separate count, and "the jury's decision as to each act was readily discernable." Dissenting opinion at 82, 237 P.3d at 1148. Although there was no basis by which to confirm the jury's verdict as to each alternative means in *Jones*, we nevertheless remanded the defendant's case for retrial on the alternative means that was supported by sufficient evidence. 96 Hawai'i at 184, 29 P.3d at 374. Thus, for double jeopardy purposes, confirmation as to the basis for the jury's verdict is not required where there is substantial evidence to support a conviction. *See id.*

*Arceo* is not to the contrary. *Arceo* was charged with one count of sexual assault in the third degree (Count I), and one count of sexual assault in the first degree (Count II). 84 Hawai'i at 2–3, 928 P.2d at 844–45. Count I involved multiple acts of "sexual contact" between Arceo and his six-year-old son (the minor). *Id.* at 3–4, 928 P.2d at 845–46. Count II involved multiple acts of "sexual penetration" with the minor. *Id.*

At trial, the minor testified inconsistently concerning the number of sexual assaults he was subjected to. *Id.* at 24 n. 25, 928 P.2d at 867 n. 25 ("the [m]inor purported to recall seven separate, distinct, and specific sexual assaults"); *id.* at 10, 928 P.2d at 852 (the minor acknowledged telling a detective "that his father had touched him approximately twelve times"). With regard to Count I, the minor testified at trial that "[Arceo] put his penis on mine" "I think once." *Id.* at 8, 928 P.2d at 850. The minor clarified, "[m]aybe it's more or maybe it's once." The minor further testified that Arceo "put his penis" on the minor's back. *Id.* at 9, 928 P.2d at 851. With regard to Count II, the minor testified that "[Arceo p]ut his finger in my butt" "[t]wice I think[,]" and that "[Arceo] put his penis in my butt[.]" *Id.* The minor further testified that Arceo touched the minor's penis with his mouth "[t]wice, I think." *Id.* at 9, 928 P.2d at 851. On cross-examination, the minor acknowledged telling a detective "that his father had touched him approximately twelve times, but that, at trial, *he could only guess* as to the number of separate instances because he could not presently remember." *Id.* at 10, 928 P.2d at 852 (emphasis added).

This court held, inter alia:

at 184 n. 30, 29 P.3d at 374 n. 30 (noting that, when reviewing a conviction for sufficiency of the evidence, we consider whether the evidence was "legally insufficient to support a conviction"); *see also Arceo*, 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40. The dissent provides no explanation for its contrary assertion that double jeopardy bars remand in the instant case, but "did not present *any risks to the double jeopardy rights* of the defendant in *Jones* [,]" dissenting opinion at 82–83, 237 P.3d at 1148–49 (emphasis added), despite the fact that there was "a genuine possibility that the jury may have acquitted" the defendant in *Jones* of the alternative means that were remanded.

that when separate and distinct culpable acts are subsumed within a single count charging a sexual assault-any one of which could support a conviction thereunder-and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense; or (2) the trial court gives the jury a specific unanimity instruction, *i.e.*, an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at 32–33, 928 P.2d at 874–75 (footnote omitted).

Accordingly, this court concluded that the trial court erred in failing to give the jury a specific unanimity instruction, and that the error was not harmless beyond a reasonable doubt. *Id.* at 33, 928 P.2d at 875. We therefore "vacate[d] Arceo's judgment of conviction and remand[ed] the matter for a new trial[.]" *Id.* We further concluded that, "[b]ecause our disposition of the present appeal is grounded in 'trial error' and the evidence adduced at trial was clearly sufficient

to support Arceo's *convictions*, double jeopardy concerns are not implicated by a new trial." *Id.* at 33 n. 40, 928 P.2d at 875 n. 40 (emphasis added).

Our opinion in *Arceo* clearly states that we found the evidence presented at trial sufficient to support "Arceo's *convictions* [,]" 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40 (emphasis added), and did not address whether there was sufficient evidence to support each and every act presented to the jury.[12] There is no indication that this court concluded, based on the minor's equivocal testimony, that there was substantial evidence to support, for example, the twelve acts of sexual contact the minor reported to the detective, *id.* at 10, 928 P.2d at 852, more than one incident of Arceo putting his penis on the minor's penis, *id.* at 8, 928 P.2d at 850, more than one incident of Arceo putting his finger in the minor's "butt," *id.* at 9, 928 P.2d at 851, or more than one incident of fellatio, *id.* at 9, 928 P.2d at 851.[13]

In the instant case, the evidence presented at trial concerning Kalaola's conduct on the first floor of ATM was clearly sufficient to support a conviction for failure to disperse. Accordingly, the double jeopardy clause is not implicated with regard to Kalaola's failure to disperse from the first floor of ATM,

---

**12.** We therefore respectfully disagree with the dissent's contention that this passage in *Arceo* indicates that "this court had determined that *each of the underlying acts* it had discussed as supporting the convictions rested on substantial evidence." Dissenting opinion at 81, 237 P.3d at 1147 (emphasis added). In support of this assertion, the dissent contends that this court discussed "*each individual act as it related to the elements of the two charged offenses* [,]" thereby "leav[ing] no question that there was substantial evidence . . . as to *each* underlying act[.]" Dissenting opinion at 78, 237 P.3d at 1144 (emphasis in original). However, the dissent's assertion is incorrect, insofar as this court merely discussed five types of "prohibited conduct," as opposed to the seven acts argued by the dissent. *Arceo*, 84 Hawai'i at 14–15, 928 P.2d at 856–57. The dissent also cites to a stipulation by the prosecution that the indictment against Arceo "covered 'all alleged sexual assaults of [the minor witness] by [the defendant] during the specified period[.]' " Dissenting opinion at 77, 237 P.3d at 1143 (brackets in original) (some quotation marks omitted) (quoting *Arceo*, 84 Hawai'i at 24, 928 P.2d at 866). However, the stipula-

tion concerning the indictment was made "to avoid double jeopardy[,]" *Arceo*, 84 Hawai'i at 6, 928 P.2d at 848, since defense counsel was concerned that the minor "made at least *nine separate allegations* of sexual abuse" during his grand jury testimony, *id.* at 5, 928 P.2d at 847, and "testified on two different occasions that there were *12 separate instances* " of sexual assault, *id.* at 7, 928 P.2d at 849. Thus, the parties' stipulation in *Arceo* does not suggest that this court found that each of the seven acts the minor testified to at trial were supported by substantial evidence.

**13.** The dissent correctly notes that "the law regarding testimony on dates, times, and places, is a separate area of law and does not go to the sufficiency of the evidence." Dissenting opinion at 80 & n. 10, 237 P.3d at 1146 & n. 10. However, the minor's testimony in *Arceo* went beyond the mere inability to recall those details, and instead extended to an inability to recall whether distinct culpable acts had even occurred on more than one occasion. 84 Hawai'i at 8–10, 928 P.2d at 850–52.

since there was sufficient evidence to support a conviction based on that act.[14]

However, double jeopardy precludes the State from again seeking a conviction of Kalaola based on his failure to disperse from the second floor of ATM. In order to obtain a conviction on retrial based on that act, the prosecution would necessarily be required to introduce additional evidence beyond that presented in the first trial. In the circumstances of this case, where the prosecution specifically argued that Kalaola's conduct on the second floor could independently support conviction, allowing the prosecution an opportunity to present necessary evidence that it "failed to muster in the first proceeding" would implicate double jeopardy. *See Quitog*, 85 Hawai'i at 140, 938 P.2d at 571 ("[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials.") (quoting *Green*, 355 U.S. at 187, 78 S.Ct. 221); *cf. Jones*, 96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30 ("the double jeopardy clause does not bar retrial on the means of establishing guilt for which there was sufficient evidence presented at trial").

## IV. Conclusion

It is undisputed that trial error occurred in the instant case, insofar as the circuit court failed to properly instruct the jury concerning (1) the statutory definition of "disorderly conduct" and (2) the applicability of the "knowingly" state of mind to each element of the offense of failure to disperse. *State v. Kalaola*, No. 29163, 2009 WL 1507291, at *2 (Hawai'i App. May 29, 2009). The two remaining questions are whether the evidence was sufficient to support Kalaola's conviction, and whether retrial is permissible under the

double jeopardy clause of the Hawai'i Constitution. We hold that sufficient evidence was presented at trial to establish that Kalaola failed to disperse from the first floor of ATM, but not from the second. Because we hold there was sufficient evidence to support Kalaola's conviction with regard to his conduct on the first floor of ATM, there was sufficient evidence "to support the conclusion of the trier of fact" that Kalaola had committed the charged offense. *See Jones*, 96 Hawai'i at 181, 29 P.3d at 371. Thus, the double jeopardy clause does not bar retrial with regard to that conduct.

Accordingly, we affirm the judgment of the ICA, and remand the case for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J., in which DUFFY, J., joins.

In my view (1) the offense of Failure to Disperse, Hawai'i Revised Statutes (HRS) § 711–1102 (1993 & Supp.2007) [hereinafter, the disperse statute], presents alternative statutory means for conviction, (2) each alternative means must be supported by substantial evidence for conviction, (3) the instant case also involves multiple acts, (4) when multiple acts are offered in support of a single count each must be supported by substantial evidence, and (5) Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) did not adduce substantial evidence as to all of the multiple acts involved in the single count of Failure to Disperse. I disagree with the majority's conclusion that the instant case should be remanded for a new trial on the act supported by substantial evidence. I believe this court's precedent compels the conclusion that, in cases such as this one, reversal is required. In this case, remand raises double jeopardy concerns inasmuch as Petitioner/Defendant–Appellant Jason Kelii-

---

**14.** The dissent asserts that "the prosecution is in a position, and has been since before *Arceo* was decided, to avoid this problem by either 1) presenting each act as a separate charge or 2) electing the specific act upon which it is seeking a conviction." Dissenting opinion at 90, 237 P.3d at 1156. However, as we noted in *Arceo*, requiring either a unanimity instruction or an election "is not intended ... to encourage the bringing of multiple charges when, in the prosecutor's judg-

ment, they are not warranted. The criteria used to determine that only a single charge should be brought[ ] may indicate that the election of one particular act for conviction is impractical." 84 Hawai'i at 31, 928 P.2d at 873 (quoting *State v. Petrich*, 101 Wash.2d 566, 683 P.2d 173, 178 (1984), *overruled on other grounds by State v. Kitchen*, 110 Wash.2d 403, 756 P.2d 105, 107 (1988)).

koaikaika Kalaola (Petitioner) will be retried for conduct of which the jury may have rejected criminal liability.

Petitioner was charged in a complaint filed on July 19, 2007, with Failure to Disperse.[1] He was convicted as charged after a jury trial. On appeal, the Intermediate Court of Appeals (ICA)(1) vacated and remanded the case for a new trial on the basis of instructional error and (2) determined that there was sufficient evidence to convict. Petitioner seeks review of the ICA's judgment filed on June 26, 2009, pursuant to its May 29, 2009 Summary Disposition Order (SDO)[2] affirming the April 18, 2008 judgment of conviction filed by the Circuit Court of the First Circuit (the court).[3] He challenges the ICA's decision that there was sufficient evidence to convict.

## I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

## A.

Respondent presented several witnesses at trial. The rendition of events following is set forth in the Application. Honolulu Police Department (HPD) Officer Keani Alapa (Officer Alapa)[4] testified that on May 18, 2007, there were "maybe 50 to 75 people fighting" on the second floor of the Aloha Tower Marketplace (ATM) where he saw Petitioner challenging people to fight. He next saw Petitioner on the first floor "acting the same way," and he arrested Petitioner.

On the second floor, Officer Alapa observed about fifty to seventy-five fights occurring. He and Officer Ryan Kaio (Officer Kaio) shouted orders to the "general group" to disperse no less than ten times. Officer Alapa observed Petitioner "challenging people to fight" and "taking an aggressive stance." On the first floor of ATM, Officer Alapa saw Petitioner again engaging in the same aggressive behavior, challenging people to fight and causing a disturbance.

Officer Kaio related that he was with Officer Alapa on the second floor of ATM for approximately five minutes, where he saw many people fighting, but not Petitioner. He testified to repeatedly telling the crowd "to leave the area."

Sgt. Albert Lee (Sgt.Lee) recounted that when he arrived at the front of ATM on the first floor, there were about 15-20 officers on the scene. When Sgt. Lee arrived he saw "small fights," "[t]here were three or four fights going on[,]" and people watching "who had nothing to do with the fight[.]" He noticed a large number of people coming down from the second floor, many of whom were "yelling at each other" and fighting. Sgt. Lee observed three or four fights happening on the first floor with a lot of people standing around in that area.

Sgt. Lee testified he noticed Petitioner "streaming out" of the second floor, yelling, swearing, and challenging people to fight. The sergeant saw Petitioner coming from the second floor and repeatedly told Petitioner to leave. When Sgt. Lee told him to leave, Petitioner responded that he was waiting for the valet to get his car. He recounted that Petitioner was being restrained by friends and that he never saw Petitioner approach the valet. Sgt. Lee left that area and returned to find Petitioner still there.

---

1. HRS § 711–1102 states as follows:
 **Failure to disperse.** (1) When six or more persons *are participating in a course of disorderly conduct* likely to cause substantial harm or serious inconvenience, annoyance, or alarm, a law enforcement officer may order the *participants and others in the immediate vicinity to disperse.*
 (2) A person commits the offense of failure to disperse *if the person knowingly fails to comply with an order made pursuant to subsection (1).*
 (3) Failure to disperse is a misdemeanor.
 (Emphases added.)

2. The SDO was filed by Presiding Judge Daniel R. Foley and Associate Judges Craig H. Nakamura and Alexa D.M. Fujise.

3. The Honorable Reynaldo D. Graulty presided.

4. The transcript refers to the officer as Officer Alapa, whereas the index to the transcript refers to him as Officer Olapa. Both of the parties used the surname "Alapa" in their briefs. Therefore, for the sake of consistency, this opinion also refers to him as "Officer Alapa."

When Sgt. Lee returned to the front area, he saw Petitioner near a person who was being arrested, and heard Petitioner say, "[Y]ou cannot arrest him." It was at that time that Sgt. Lee ordered Petitioner arrested for failure to disperse.

Sgt. Brian Taniguchi (Sgt. Taniguchi) testified he was near the front entrance area, did not see any fights, and saw Sgt. Lee and Officer Alapa attempting to have Petitioner leave. Sgt. Taniguchi "pepper-sprayed" Petitioner in the course of arresting him.

### B.

For the defense, Rocky Contado (Contado) testified that he drove with Petitioner to ATM, that he left his van with a valet, and that when the fighting started Petitioner was with him inside of an establishment called "Bikinis Cantina." He testified that the police never entered Bikinis Cantina, and that, as he and Petitioner were leaving, he gave the valet ticket to Petitioner "because he had to return to Bikinis Cantina."

However, about ten minutes later, Contado saw Petitioner on the ground in handcuffs. Contado maintained that "prior to returning to Bikinis Cantina, Contado was with [Petitioner] the entire night and Contado did not see [Petitioner] fighting, no one tried to fight with [Petitioner], and the police officers were not interacting with [Petitioner]."

Kainoa Jardine (Jardine), a music promoter, testified that he had two groups playing music at Bikinis Cantina. He related that Petitioner accompanied him to load equipment into Contado's van after the fighting broke out, and Petitioner went to look for a valet to retrieve their car.

Jardine related that he "saw a police officer approach [Petitioner]" while Petitioner was waiting for the valet. Jardine "noticed that the police officer appeared mad, getting so close to [Petitioner] that the police officer almost bumped him," but Jardine could not hear what the police officer was saying. According to Jardine, Petitioner was not angry or yelling, nor had he challenged people to fight when the police arrested Petitioner. Jardine saw another police officer come up from behind Petitioner and take him down to the ground, handcuffing him and spraying him with mace.

Petitioner testified in his own defense. He stated that he rode with Contado to ATM in Contado's van. He did not yell, call "people out," or fight. According to Petitioner, he was inside the bar during the fighting and the police did not say anything to him. He further maintained that, while he was looking for a valet on the first floor, he did not observe any fighting there. Petitioner asserted that after taking music equipment downstairs, he tried to locate the valet to retrieve his car.

According to Petitioner, he heard officers telling everyone to leave, Officer Benjamin Ohai (Officer Ohai) told him to "hold up" and to leave the area, and he told Officer Ohai and Sgt. Lee he was attempting to find a valet. Then Sgt. Lee became angry with him, Officer Alapa bumped him and called him a "punk," and forced Petitioner to the ground.

### C.

The Complaint in this case contained only one charge as follows:

> On or about the 19th day of May, 2007, in the City and County of Honolulu, State of Hawaii, [Petitioner], *as one (1) of six (6) or more persons participating in a course of disorderly conduct* likely to cause substantial harm or serious inconvenience, annoyance, or alarm, *or as a person in the immediate vicinity, failed to obey a law enforcement officer's order to disperse,* in violation of Section 711–1102(1) of the [HRS].

(Emphases added.)

In pertinent part the court instructed the jury as to the elements of the disperse statute in Instruction No. 14 as follows:

> There are three material elements to the offense of failure to disperse[,] each of which [Respondent] must prove beyond a reasonable doubt.

> These three elements are:

> One, that on or about the 19th day of May 2007[,] in the City and County of Honolulu, State of Hawaiʻi[, Petitioner]

*was one of six or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm or he was a person in the immediate vicinity.*

Two, [Petitioner] *failed to comply with a law enforcement officer's order to disperse.*

And three, [Petitioner] did so knowingly.

(Emphases added.)

In that connection, the relevant parts of Respondent's closing arguments to the jury follow. Respondent first argued that Petitioner was one of six or more persons engaged in disorderly conduct.

Instruction No. 14, it lays out three essential elements that [Respondent] must prove in finding [Petitioner] guilty of failure to disperse.

First, that on or about the 19th day of May 2007[,] in the City and County of Honolulu, State of Hawaii, [Petitioner] was one of six or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance or alarm or he was a person in the immediate vicinity.

And two, [Petitioner] failed to comply with a law enforcement officer's order to disperse.

. . . .

*Number one, the first thing that we have to prove is that [Petitioner] was one of six or more people participating in a course of disorderly conduct likely to cause substantial harm, serious inconvenience, annoyance or alarm or he was a person in the immediate vicinity.*

So if we take a look at that and we take a look at the incidents in this case, first, at around 12:25 a.m. on May 19th, 2007[,] Officers Alapa and Kaio were called to the [ATM] on a report of a large fight.

*Officer Kaio estimates between 30 or 40 people were fighting*

*Officer Alapa estimates 50 to 75 people were fighting.*

Either one, obviously they didn't get an exact count, but *there were certainly more than six people involved in this.*

When they arrived, they arrived on the east part of [ATM].

They come into the marketplace. They hear loud noises. They hear yelling.

Respondent then described the second floor incident.

They go upstairs and then they see people fighting.

Officer Alapa testifies that most of the fighting was going on over here, but it actually spread all over the second floor of [ATM].

Officer Kaio testified likewise.

At that point, those were the only two officers on the scene.

. . . .

In the meantime, Officer Alapa, among the many people that were fighting, *Officer Alapa notices [Petitioner]. He was there yelling, challenging people to a fight, using profanity.*

At that point, Officer Alapa tells [Petitioner] and some of the other people to move on, to leave, to disperse.

He didn't ask them to do that. He told them to do that as a way to break up the fight.

[Petitioner] did not adhere to the order to disperse.

*Officer Alapa said that he ordered [Petitioner] to disperse around ten times while he was on the second floor, and [Petitioner] did not comply with that.*

(Emphases added.)

Respondent subsequently described the first floor incident.

Sergeant Lee sees [Petitioner] on the first floor. He comes down. He—[Petitioner] goes towards the front area on the first floor of [ATM] near the parking lot near the valet. They basically exit [ATM].

Sergeant Lee observes [Petitioner]. *He observes [Petitioner] getting agitated. He observes him yell. He observes him challenging people to fight.*

*He also observes that other people were holding back [Petitioner].*

Sergeant Lee said—told [Petitioner] to leave, as well.

He didn't ask him to do that. He told them to do that.

Again, [Petitioner] failed to do so.

*In the meantime, there were other fights going around.* There was a fight going around in the parking lot there, as well.

. . . .

Sergeant Lee made an arrest.

He comes back up. He sees [Petitioner] (inaudible) he told [Petitioner] to leave, to go to the valet.

[Petitioner] has failed to do so.

Sergeant Lee (inaudible) to arrest [Petitioner] at that point.

[Petitioner]—*he told [Petitioner] to leave again. [Petitioner] does not leave.*

So Sergeant Lee testifies that [Petitioner] was starting to get aggressive towards more people.

At that time, *that's when Sergeant Lee made the order to arrest [Petitioner] for failure to disperse.*

Ladies and gentlemen, that in relation to the elements of the offense is, *number one,* [Petitioner] was there.

In fact, *he was one of six or more people engaging in the course of disorderly conduct.*

(Emphases added.)

Respondent argued that orders to disperse were given on the second and first floors.

Number two, the second element, Officer Alapa on the second floor of [ATM] ordered [Petitioner] to leave and to disperse approximately ten times. [Petitioner] failed to do so.

Downstairs, *Sergeant Lee ordered [Petitioner] to disperse around ten times* over two different spans of times. *[Petitioner] failed to do so.*

. . . .

Now, ladies and gentlemen, another instruction which is also important that you must follow is Instruction No. 17, which shows that the law allows the introduction

of evidence for the purpose of showing there was more than one act upon which proof of an element of an offense may be based.

. . . .

Basically, ladies and gentlemen, *what that means is, number one, the incident on the second floor and, number two, the incident on the first floor.*

*The incident on the second floor is when [Petitioner] was engaging in—was calling people out and Officer Alapa told [Petitioner] to disperse and [Petitioner] did not do so.*

. . . .

*The second incident, this is the incident with Sergeant Lee downstairs.*

(Emphases added.)

Respondent argued "both" the second and first floor incidents were separate violations of HRS § 711–1102.

Ladies and gentlemen, *both did happen in this case, [Petitioner] failed to comply with Officer Alapa's orders to disperse on the second floor and he failed to comply with Sergeant Lee's orders to disperse on the first floor.*

Ladies and gentlemen of the jury, ultimately, the evidence that's been presented to this case ultimately comes down to the issue of credibility, who to believe.

Do you believe the officers?

Or do you believe [Petitioner's] witnesses?

(Emphases added.) The court did give a specific unanimity instruction[5] pertaining to multiple acts. Instruction No. 17 stated:

The law allows the introduction of evidence for the purpose of showing that there is more than one act upon which proof of an element of an offense may be based. *In order for the prosecution to prove an element, all twelve jurors must unanimously*

---

**5.** A general unanimity instruction is one that instructs the jury that it must be unanimous as to the general verdict of guilty or not guilty on a particular count. *See State v. Apao*, 95 Hawai'i 440, 442, 24 P.3d 32, 34 (2001) (reciting the general unanimity instruction that the trial court gave, which stated that, "[a]t the close of trial, the jurors were instructed, generally, that they

must be unanimous as to the verdict"). In contrast, a specific unanimity instruction is defined as "an instruction that advises the jury that all twelve of its members must agree *that the same underlying criminal act* has been proved beyond a reasonable doubt." *State v. Arceo*, 84 Hawai'i 1, 33, 928 P.2d 843, 875 (1996) (emphasis added).

*agree that the same act has been proved beyond a reasonable doubt.*

(Emphasis added.)

### D.

On appeal to the ICA, Petitioner argued that "1) the court failed to properly instruct the jury regarding the material elements for the charged offense; and 2) Respondent failed to adduce sufficient evidence to establish each alternative means of committing the offense that was presented to the jury." *State v. Kalaola*, No. 29163, 2009 WL 1507291, at *1 (Hawai'i App. May 29, 2009)(SDO).

With respect to the first argument, the ICA considered the commentary on HRS § 711–1102 which stated "that the offense of Failure to Disperse is 'an aggravated form of disorderly conduct.'" According to the ICA, the statutory definition of "disorderly conduct" should have been included in the jury instructions and, thus, it vacated the judgment of the court and remanded the case for a new trial. *Kalaola*, 2009 WL 1507291, at *2.

With respect to the second argument, Petitioner contended that there was not "sufficient evidence to establish each alternative means of committing the offense that was presented to the jury." *Id.* at *1. The ICA stated that

> [t]he failure to disperse offense may be proved by alternative means, namely, that [Petitioner] knowingly was either one of six or more persons participating in a course of disorderly conduct *or* in the immediate vicinity thereof, when [Petitioner] knowingly failed to comply with a law enforcement officer's order to disperse.

*Id.* at *2 (emphasis added). The ICA summarily concluded that "there was sufficient evidence to prove that [Petitioner] engaged in conduct constituting the charged offense." *Id.* at *3.

### II.

Petitioner lists the following question in his Application: "Whether the ICA gravely

erred in holding that there was sufficient evidence to establish each alternative means of failure to disperse." Respondent did not file a memorandum in opposition to Petitioner's Application to this court.[6]

### III.

### A.

Petitioner argues that his case involves statutory alternative means of committing the offense. According to Petitioner, "[i]n an alternative means case, where it is impossible to tell which alternative theory the jury's verdict is based upon, due process requires that each of the alternative means presented to the jury be supported by legally sufficient evidence." (Citing *State v. Jones*, 96 Hawai'i 161, 181, 29 P.3d 351, 371 (2001); *State v. Gager*, 45 Haw. 478, 493, 370 P.2d 739, 747 (1962).) Petitioner asserts that "[b]ecause it is possible that the jurors based their decision on a theory which was not supported by legally sufficient evidence, [Petitioner's] rights to due process and a unanimous verdict were violated and the conviction must be set aside." (Citing *Jones*, 96 Hawai'i at 181, 29 P.3d at 371; *Gager*, 45 Haw. at 493, 370 P.2d at 747.)

The definition of an alternative means case is as follows:

> In an alternative means case, *where a single offense may be committed in more than one way*, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed *so long as substantial evidence supports each alternative means*. In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found *each means* of committing the crime proved beyond a reasonable doubt.

*State v. Rabago*, 103 Hawai'i 236, 251–52, 81 P.3d 1151, 1166–67 (2003) (quoting *Jones*, 96 Hawai'i at 170, 29 P.3d at 360) (emphases added). As to the sufficiency of evidence in

---

**6.** Also, Respondent did not file an application for certiorari from the ICA judgment remanding to the court to instruct the jury on the definition of disorderly conduct.

an alternative means case, this court has said:

> In other words, in an alternative means case where it is impossible to tell which alternative the jury's verdict is based upon, does due process require that each of the alternative means presented to the jury be supported by legally sufficient evidence?
>
> . . . .
>
> . . . [B]ased on our analysis of [the d]efendant's rights to a unanimous verdict and to due process under article I of the Hawai'i Constitution, we hold that unanimity is not required where alternative means of establishing an element of an offense are submitted to the jury, *provided that there is no reasonable possibility that the jury's verdict was based on an alternative unsupported by sufficient evidence.*

*Jones*, 96 Hawai'i at 178, 181, 29 P.3d at 368, 371 (emphasis in original and emphasis added).

### B.

In considering Petitioner's argument, it must first be determined whether the statute does set forth statutory alternative means of committing the offense of failure to disperse. *See State v. Klinge*, 92 Hawai'i 577, 585, 994 P.2d 509, 517 (2000) (determining first whether a defendant's "constitutional right to a unanimous verdict was violated because" statutes setting forth alternate mental states were separate offenses or whether the two mental states were simply alternative means). If the statute does, it must be decided whether both alternatives are supported by substantial evidence. *Jones*, 96 Hawai'i at 181, 29 P.3d at 371 (holding "that unanimity is not required where alternative means of establishing an element of an offense are submitted to the jury *provided that* there is no reasonable possibility that the jury's verdict was based on an alternative *unsupported by sufficient evidence* " (first emphasis in original)) (second emphasis added).

The test for ascertaining whether a statute sets forth alternative means or separate crimes is "whether the level of verdict specificity required by the [jury] instructions was rational and fair, considering history and practice, and the degree of blameworthiness and culpability." *Klinge*, 92 Hawai'i at 587, 994 P.2d at 519 (internal quotation marks and citation omitted). In *Klinge*, the question was whether two possible mental states that satisfied the mental state required for terroristic threatening "[gave] rise to independent elements defining separates crimes[.]" *Id.* at 589, 994 P.2d at 521. *Klinge* first looked to the "history and wide practice as guides to fundamental values." *Id.* at 587, 994 P.2d at 519. However, nothing in the language of the statute or Hawai'i case law indicated that the two mental states should be treated as separate crimes.

Second, this court considered whether the two mental states "reasonably reflect notions of equivalent blameworthiness and culpability." *Id.* at 588, 994 P.2d at 520 (citation omitted). In its analysis of this prong, *Klinge* noted that there was "no practical difference in culpability" between the two mental states. *Id.* Where two means do not "reasonably reflect notions of equivalent blameworthiness or culpability," election of the specific means or a unanimity instruction may be required. *Id.* at 577 n. 6, 994 P.2d at 520 n. 6. However, *Klinge* concluded that "[t]he level of culpability between the two alternatives is not morally disparate in any significant sense." *Id.* Thus, under the two-pronged test, the mental states did not result in separate crimes.

In *Jones*, the defendant was charged with multiple counts of Sexual Assault in the Second Degree and Sexual Assault in the Fourth Degree. 96 Hawai'i at 163, 29 P.3d at 353. The jury was instructed as to two different mental states, absence of consent and ineffective consent. *Id.* at 165, 29 P.3d at 355. This court considered "whether the alternative theories of guilt presented to the jury regarding the lack of legal consent—(1) the absence of consent or (2) ineffective consent . . . —define separate crimes or may be treated as alternative means of establishing an element of a single offense." *Id.* at 174, 29 P.3d at 364. Applying the *Klinge* test, *Jones* concluded that "alternative theories of absence of consent and ineffective consent do not represent separate crimes; rather, they are alternative means of proving the attend-

ant circumstance element of a single crime." *Id.*

Referring to *Klinge, Jones* first looked to the "language and history of the relevant statutory provisions[.]" *Id.* It noted that the commentary to the parallel Model Penal Code § 2.11 "[made] clear that the consent provisions deal generally with the concept of consent and must be analyzed in the context of the particular offenses to which they apply." *Id.* at 174–75, 29 P.3d at 364–65 (citing Model Penal Code and Commentaries (Official Draft and Revised Comments 1985)) [hereinafter, MPC] § 2.11, cmt. 1 at 394. As such, absence of consent and ineffective consent did not "define discrete or separate offenses." *Id.* at 175, 29 P.3d at 365.

*Jones* also examined cases from Hawai'i and other jurisdictions indicating that "absence of consent and ineffective consent reflect equivalent notions of blameworthiness." *Id.* Based on these factors, *Jones* concluded that the two mental states set forth alternative means.

### C.

The plain language of HRS § 711–1102, *see supra* note 1, makes it applicable to those participating in "disorderly conduct" and those in the "immediate vicinity" of disorderly conduct. Thus, the instant case presents the same issue of whether statutory alternatives are alternative means requiring a unanimity instruction "or instead create separate crimes requiring individual proof." *Klinge,* 92 Hawai'i at 586, 994 P.2d at 518. This court must consider "several factors, including, but not limited to, the language and legislative history of relevant statutes, the history and practice in Hawai'i and other jurisdictions, and whether the alternatives reflect equivalent notions of blameworthiness and culpability." *Jones,* 96 Hawai'i at 173–74, 29 P.3d at 363–64 (citation omitted). However, the history and practice of other jurisdictions is unhelpful. The language of various statutes criminalizing refusal to disperse or failure to disperse varies greatly, making comparisons difficult. Furthermore, no cases addressing whether such statutes set forth alternative means or separate offenses were found.

The legislative history of HRS § 711–1102 does not make reference to anything indicating an intent to treat the statute as setting forth separate crimes as opposed to alternative means of committing the same offense. The commentary to HRS § 711–1102 briefly mentions that the statute "provides a procedure under which" police officers may order both those "participating in a course of disorderly conduct" as well as those "in the immediate vicinity" to disperse. Reference to the fact that police officers give "similar order[s]" to both groups provides some support for the proposition that alternative means are described in HRS § 711–1102. HRS § 711–1102 cmt. (1993).

The legislative history indicates that enactment of HRS § 711–1102 was part of a "complete reorganization of the criminal law of the State of Hawaii" and is "a derivative of the [MPC.]" Conf. Comm. Rep. No. 1, in 1972 House Journal, at 1035. An examination of the parallel MPC section does provide some insight into the statute. HRS § 711–1102 is almost identical to MPC § 250.1, which states in relevant part:

> (2) Failure of Disorderly Persons to Disperse upon Official Order. *Where [three] or more persons are participating in a course of disorderly conduct* likely to cause substantial harm or serious inconvenience, annoyance or alarm, a peace officer or other public servant engaged in executing or enforcing the law *may order the participants and others in the immediate vicinity to disperse.* A person who refuses or knowingly fails to obey such an order commits a misdemeanor.

(Emphases added.) The explanatory notes of MPC § 250 indicate that its general purpose is "to provide a rational grading of penalties [for riot, disorderly conduct and related offenses] and especially to limit the discretion of the minor judiciary to impose substantial imprisonment for petty infractions[.]"

A cursory glance at the statute may raise questions as to why those in the immediate vicinity should be punished to the same degree as those who are causing the "substantial harm or serious inconvenience."

However, the MPC commentary to § 250.1 addresses these concerns, stating in relevant part as follows:

[Failure of Disorderly Persons to Disperse extends] liability to anyone who refuses or knowingly fails to depart from the immediate vicinity as ordered, *even if he was not personally a participant in the disorderly conduct there occurring. Liability on these terms is largely a response to practical necessity. Law enforcement officers who confront a public disturbance threatening substantial harm or serious inconvenience need the authority to require that the crowd disperse and to demand compliance from everyone there present* . . . . This does not mean that mere presence should suffice for criminal liability, but it does support imposition of penal sanctions for refusal or knowing failure to move on. *This much inconvenience can be reasonably demanded of any citizen to avoid escalation of the disorder and possible violence.*

MPC at 232 (emphases added).

The commentary plainly states that the treatment afforded these two seemingly distinct groups is a "practical necessity" inasmuch as those in the immediate vicinity who fail to disperse may seriously impede officers' attempts to prevent disturbances that threaten substantial harm. It is manifest that refusal to leave the scene of a disturbance increases the risk that the disturbance will escalate. Thus, the commentary compels the conclusion that equal notions of blameworthiness apply to the two distinct groups liable under MPC § 250.1 and HRS § 711–1102 and that the statute should be construed as setting forth alternative means.

HRS § 711–1102 sets forth distinct alternative means. As the court's jury instructions state, a person *commits the offense of failure to disperse* when he or she (1)(a) is one of six or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm, or (1)(b) is in the immediate vicinity of one of six or more persons

participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm, and (2) knowingly fails to comply with a law enforcement officers's order to disperse. To sustain the conviction with regard to statutory alternative means, the prosecution must have adduced substantial evidence with regard to the statutory alternative means set forth in sections (1)(a) and (1)(b).[7]

### IV.

Two issues not discussed in *Klinge* were raised in *Jones*. The first was "whether jury unanimity is required when the jury is presented with alternative means of establishing an element other than mental state; and [the second,] whether due process requires sufficient evidence of each alternative means to uphold a verdict where it is impossible to tell which alternative the jury relied upon." *Jones*, 96 Hawai‘i at 174, 29 P.3d at 364. In *Jones*, this court held that "[a] defendant's rights are clearly prejudiced where the jury is instructed that it may find him guilty based upon a theory of guilt that is not supported by sufficient evidence as a matter of law." *Id.* at 181, 29 P.3d at 371.

To reiterate, *Jones* stated that "unanimity is not required where alternative means of establishing an element of an offense are submitted to the jury, *provided that* there is no reasonable possibility that the jury's verdict was based on an alternative unsupported by sufficient evidence." *Id.* (emphasis in original). Thus, for example, when a jury is presented with two alternative means, one of which is supported by substantial evidence and the other is not, a defendant's "rights to a unanimous verdict and to due process under article I of the Hawai‘i Constitution" are violated. *Id.*

### V.

### A.

Petitioner indirectly argues that his case is also a multiple-acts case. A multiple-acts

---

7. As discussed further *infra*, the statutory alternatives presented in *Jones* related to two different means by which the prosecution could nega-

tive the defense of consent to several of the charges of sexual assault. 96 Hawai‘i at 166–67, 29 P.3d at 356–57.

cases is one in which "several acts are alleged [in one count] and any one of them could constitute the crime charged[.]" *Id.* at 170, 29 P.3d at 360. They are distinct acts that could be charged as separate counts. *Id.* In such cases, "[this court] requires that either the State elect the particular criminal act upon which it will rely for conviction, or the trial court instruct the jury that *all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.*" *Id.* (citations omitted) (emphasis added).

In remanding the case for a new trial and ordering the court to give a specific unanimity instruction, *Arceo* stated, "Because our disposition of the present appeal is grounded in 'trial error' *and the evidence adduced at trial was clearly sufficient to support [defendant's] convictions,* double jeopardy concerns are not implicated by a new trial." *Arceo,* 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40 (emphasis added). In other words, remand, and not reversal, was appropriate because there was substantial evidence to sustain a conviction on each of the multiple acts underlying each count. Otherwise, remand as to *all* of the acts could not have resulted. Thus, the record must contain substantial evidence for each of the multiple acts offered in support of a single count. *Id.* Consequently, "[t]he test on appeal is not whether guilt is established beyond a reasonable doubt [as to an act], but whether there was substantial evidence to support the conclusion of the trier of fact." *State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citations omitted). "Substantial evidence ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks and citations omitted).

### B.

However, a unanimity instruction is not required where a charged offense is based on a single incident of culpable conduct. *See State v. Valentine,* 93 Hawai'i 199, 208–09, 998 P.2d 479, 488–89 (2000) (holding that a unanimity instruction was not required

where evidence showed only a single episode between the defendant and a police officer, "during which the two allegedly engaged in a continuous struggle for possession and control of [a] firearm"). Similarly, "no specific unanimity instruction is necessary where the defendant is charged with a continuing offense, based on facts and circumstances that constitute a continuing course of conduct." *Rabago,* 103 Hawai'i at 250, 81 P.3d at 1165 (internal quotation marks and citations omitted).

Respondent concedes that in presenting the issue at trial, the prosecution separated the incident into conduct on the second floor and conduct on the first floor, arguing that "[Petitioner] was actively engaged in disorderly conduct in two (both) instances and that he failed to follow the officer's orders to leave subsequent to each incident." In spite of this, Respondent argued on appeal that the situation is analogous to a physical attack in that the charge would "not be parsed into separate components" for each blow delivered. In other words, according to Respondent, "[Petitioner] was engaged in a single violation of the statute through a continuing course of conduct comprising failure to disperse in its totality[.]"

However, the prosecution may not argue on appeal a different theory than was argued before the court. *See State v. Sunderland,* 115 Hawai'i 396, 399–400, 168 P.3d 526, 529–30 (2007) (concluding that Petitioner made an argument at trial that "differ[ed] from the argument [he sought] to assert on appeal" and, therefore, the court would not address it (citing HRS § 641–2 (Supp.2004) ("The appellate court ... need not consider a point that was not presented in the trial court in an appropriate manner."))); *State v. Rodrigues,* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (holding that, on appeal, when seeking a reversal on a motion to suppress, the State was precluded from raising the issue of a "good faith" exception to the exclusionary rule because "[i]t is a generally accepted rule that issues not raised at the trial level will not be considered on appeal") (citations omitted). Moreover, "[t]he doctrine of judicial estoppel 'prevents parties from playing fast and loose with the court or blowing hot and

cold during the course of litigation.' " *State v. Fields,* 115 Hawai'i 503, 534, 168 P.3d 955, 986 (2007) (quoting *Roxas v. Marcos,* 89 Hawai'i 91, 124, 969 P.2d 1209, 1242 (1998) (citations and some internal quotation marks omitted)). Therefore, the single continuing offense theory need not be considered.

Nevertheless, an examination of the argument on the merits reveals that Respondent's single continuous offense theory is incorrect. Respondent relies on *State v. Temple,* 65 Haw. 261, 267 n. 6, 650 P.2d 1358, 1362 n. 6 (1982), for the "continuing offense" proposition as follows:

> A *continuing offense* is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy ... not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences.

(Quoting 22 C.J.S. *Criminal Law* § 1, at 6 (1961). (Emphasis in original.)) Citing to the case notes [8] to HRS § 711–1102 (Supp. 2007) referred to above, Respondent asserts that because the police were still in the process of having people disperse and that fights had broken out on the first floor as people left the second floor, the need to prevent the harms listed in the disperse statute had not come to an end.

But Respondent's citation to *Temple* is inapposite. *Temple* involved the arrest and conviction of the defendant for the alleged theft of a firearm. *Temple,* 65 Haw. at 266, 650 P.2d at 1361. The defendant argued that the three-year statute of limitations had passed. *Id.* The statute in that case, HRS § 708–830(8), stated that the person committed the offense if he " 'intentionally receives, *retains,* or disposes of the property of another, knowing that it is stolen[.]' " *Id.* at 266 n.

4, 650 P.2d at 1361 n. 4 (quoting HRS § 708–830(8)) (emphasis added). *Temple* concluded that the statute's use of the term "retain" meant that the crime was a "continuing offense" that tolled the statute of limitations. *Id.* at 265, 650 P.2d at 1361. Thus, the defendant's conduct of retaining the weapon for the more than three years prior to his indictment constituted an ongoing offense under the plain meaning of the statute.

In contrast, the disperse statute does not contain similar language. HRS § 711–1102 simply grants police officers the power to arrest those who have knowingly failed to disperse after having been ordered to do so. The plain language of the statute indicates that a violation occurs by a single instance of failing to comply with a police officer's order to disperse. However, as the answering brief concedes, in presenting the issue at trial, Respondent separated the case into two parts, "number one, the incident on the second floor and, number two, the incident on the first floor[,]" and argued Petitioner was guilty of "both." Thus, Petitioner's case is manifestly also a multiple acts case.

## VI.

Based on the foregoing, it must be determined whether the multiple acts, both the act on the first floor of ATM and the act on the second floor, provided substantial evidence to sustain Petitioner's conviction for all of the elements of HRS § 711–1102, including both of the statutory alternative means. To reiterate, the two statutory alternative means are that (1) Petitioner was one of six or more people participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm, or (2) Petitioner was in the immediate vicinity of six or more people participating in a

---

8. In the answering brief, Respondent mistakenly asserts that the above citation is to the commentary to HRS 711–1102. The citation, however, is to the statute "case notes." Case notes are not recognized authority on statutory interpretation.

The commentary on HRS 711–1102 actually states:

> This section provides a procedure under which a peace officer can order a group of six or more persons participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm to disperse. A similar order may be made to others in the immediate vicinity. Failure to obey such an order is a misdemeanor. The offense is thus an aggravated form of disorderly conduct which does not reach the point of riot or unlawful assembly.

> Previous Hawaii law contained a somewhat similar section allowing an order to disperse after "force of violence has been used disturbing the public peace."

course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm. Additionally, there must be substantial evidence that Petitioner knowingly failed to comply with the police officer's order to disperse.

### A.

As to the incident on the second floor, there is not substantial evidence to support Petitioner's conviction. Testimony of the officers who responded to the fights on the second floor of ATM stated that Petitioner was seen upstairs "in the same general central area" where there were an estimated "50 to 70 people fighting." Petitioner himself testified that "the whole floor was packed" and there were about 200 people there. When Officer Alapa saw Petitioner he was "challenging people to fight." Thus, there is evidence in the record that "six or more persons were participating in a course of disorderly conduct" and that Petitioner was either "participating" in the conduct or a person "in the immediate vicinity[.]" HRS § 711–1102.

Second, Respondent must show that Petitioner knew of the order to disperse. Officer Alapa's testimony did not indicate that he addressed Petitioner directly or was in any way able to capture his attention. However, Officer Alapa "addressed the general group" of which Petitioner was a part, asking them to leave, although he did not address Petitioner personally. Officer Alapa stated that Petitioner "did not leave at that time[.]" According to Officer Alapa, it took about twenty minutes before they "got a lot of people to leave the second floor and (inaudible) proceed downstairs." But there is no evidence that Officer Alapa had Petitioner in view for the entire twenty minutes or that Petitioner was on the second floor for twenty minutes. Indeed, Officer Kaio asserted that he and Officer Alapa were on the second floor for only about five minutes. Thus, Respondent was unable to establish how much time had passed before Petitioner left the second floor. Both Officers Alapa and Kaio testified that they had to deal with a number of different situations on the second floor.

However, it was clearly established that Petitioner was seen on the first floor by Officer Alapa when the officer went downstairs. Viewing the evidence in the light most favorable to the prosecution, the evidence could support the inference that Petitioner did hear the order to leave inasmuch as he left for the first floor. Hence, the statute's requirement that Petitioner know about the order was satisfied.

The final issue in regard to Petitioner's upstairs conduct is whether or not he complied with the order to leave. "While a defendant's state of mind can rarely be proved by direct evidence, 'the mind of an alleged offender may be read from his or her acts or conduct and the inferences fairly drawn from all of the circumstances.'" *State v. Pudiquet,* 82 Hawai'i 419, 425, 922 P.2d 1032, 1038 (1996) (holding that it could be "fairly inferred from defendant's threatening statements" that he intended to influence the testimony of a witness (citing *State v. Leung,* 79 Hawai'i 538, 544, 904 P.2d 552, 558 (1995))).

Petitioner's presence downstairs a short time after the order was given is evidence of Petitioner's compliance with the order to disperse. Conviction requires that Petitioner knowingly failed to comply with the officers' orders to leave. There is no substantial evidence that Petitioner knowingly failed to comply with the order to disperse; rather, the evidence appears to be to the contrary.

Furthermore, the statute is silent as to the time frame within which Petitioner was required to disperse. HRS § 711–1102 only requires that he "knowingly fail to comply with the order" to leave the immediate area. The willful act of disobeying an order to leave cannot be inferred by Petitioner's conduct because he was seen downstairs a short time later. Thus, Respondent did not adduce "[s]ubstantial evidence as to every material element of the offense charged[.]" *Richie,* 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted). Consequently, there was no substantial evidence establishing that Petitioner did not comply with the order to disperse from the second floor, and, thus, the evidence was insufficient

to sustain Petitioner's conviction for his actions on the second floor.

### B.

As to the incident on the first floor, it appears there was substantial evidence to support Petitioner's conviction. The testimony of Officers Alapa, Kaio, and Sgt. Lee indicates that they saw Petitioner on the first floor of the ATM complex. Officer Alapa's testimony was silent as to the number of people on the first floor, but Sgt. Lee estimated that there were about fifty people "streaming out [from upstairs]" and that "they were all still yelling and fighting."

Sgt. Lee first saw Petitioner "streaming out in [the] area." He observed Petitioner yelling, swearing, and "challenging people to fight." His friends were physically restraining him. Sgt. Lee testified that "there were three or four fights going on[.]" Obviously, a fight would include at least two people. Hence, there was sufficient evidence to support the inference that there were at least six people engaged in disorderly conduct on the first floor. The record thus establishes that Petitioner was either part of a group of six or more persons or, arguably, in the immediate vicinity of six or more persons who were "participating in a course of disorderly conduct likely to cause substantial harm or serious inconvenience, annoyance, or alarm[.]" HRS § 711–1102.

Sgt. Lee approached Petitioner and "told him to leave the area." According to Sgt. Lee's testimony, Petitioner refused to do so and Sgt. Lee had to tell Petitioner to leave at least ten more times. Petitioner's refusal to leave, as testified to by Sgt. Lee, constitutes substantial evidence that Petitioner "knowingly fail[ed] to comply with an order" to disperse. HRS § 711–1102. "[T]he testimony of a single witness, if found by the trier of fact to have been credible, will suffice [to establish substantial evidence]." *In re Doe,* 95 Hawai'i 183, 196, 20 P.3d 616, 629 (2001) (citing *State v. Eastman,* 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996)) (other citations omitted). *See also id.* at 197, 20 P.3d at 630 (holding that the record contained substantial evidence to support "the family court's determination that Mother [was] not willing and

able to provide" a safe environment for the child). Thus, there was substantial evidence to support Petitioner's conviction for his actions on the first floor.

### C.

In sum, there was not substantial evidence that Petitioner failed to disperse on the second floor, however, there was substantial evidence that Petitioner failed to disperse on the first floor. Respondent argued to the jury that Petitioner violated the disperse statute on *both* floors. If the jury accepted Respondent's theory as to "both" incidents, it was wrong, because there was not substantial evidence to support conviction for the second floor events. If the jury decided to base its conviction on only one of the floors, it is impossible to determine whether the jury relied on the second floor incident for which there was insufficient evidence, or on the first floor incident.

*Arceo* stated that "an accused in a criminal case can only be convicted upon proof by the prosecution of every material element of the crime charged beyond a reasonable doubt, ... [and this] constitutional 'precept' also implicates the defendant's right to due process of law[.]" *Arceo,* 84 Hawai'i at 30, 928 P.2d at 872 (internal quotation marks and citations omitted). Thus, the *Arceo* requirement that "an instruction that advises the jury that all twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt" is grounded in the same due process protection in article I, sections 5 and 14 of the Hawai'i Constitution. *Id.* at 33, 928 P.2d at 875. *Arceo* also indicated that because "the evidence adduced at trial was clearly sufficient to support [the defendant's] convictions, double jeopardy concerns are not implicated by a new trial." *Id.* at 33 n. 40, 928 P.2d at 875 n. 40 (citing *State v. Wallace,* 80 Hawai'i 382, 413–14, 910 P.2d 695, 726–27 (1996)). Hence, the *Arceo* requirement that there be substantial evidence as to each specific act underlying a count, implicates the right against double jeopardy in article I, section

10 of the Hawai'i Constitution in cases involving issues of sufficiency of the evidence.[9]

## VII.

### A.

At oral argument the issue was raised as to whether remanding for a new trial on the alternative means and multiple acts supported by substantial evidence would violate the double jeopardy clause. Although this issue was not raised by Petitioner in either the briefs or Application, this court has "the power to *sua sponte* notice plain errors or defects affecting substantial rights[.]" *State v. Hernandez*, 61 Haw. 475, 482, 605 P.2d 75, 79 (1980). "Moreover, we have previously held that a defendant's right to be free from double jeopardy is just such a substantial right as to be noticeable by the court." *State v. Miyazaki*, 64 Haw. 611, 616, 645 P.2d 1340, 1344 (1982) (citing *State v. Martin*, 62 Haw. 364, 373, 616 P.2d 193, 199 (1980)).

### B.

In addressing whether double jeopardy precludes retrial, this court has distinguished between "trial error" and "evidentiary insufficiency."

*[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case.* As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, *it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect,* e.g., incorrect receipt or rejection of evidence, *incorrect instructions,* or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

*State v. Hamala*, 73 Haw. 289, 293, 834 P.2d 275, 277 (1992) (quoting *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)) (emphases added), *rev'd on other grounds by State v. Rogan*, 91 Hawai'i 405, 423 n. 10, 984 P.2d 1231, 1249 n. 10 (1999).

In *Jones*, this court stated that remanding the defendant's case for a new trial on the statutory alternative supported by substantial evidence would not violate the double jeopardy clause, but acknowledged the distinction between a remand for trial error and reversal for insufficient evidence.

We note that our disposition in this case does not implicate the double jeopardy clause of article I, section 10 of the Hawai'i Constitution. *The double jeopardy clause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction.* However, retrial is not barred when the reviewing court reverses a case due to trial error, such as erroneous jury instructions. Although our holding in this case is based, in part, on our conclusion that the jury instruction regarding ineffective consent *raised the possibility that the verdict was based on an alternative means of establishing guilt not supported by legally sufficient evidence, it is undisputed that there was legally sufficient evidence of the other alternative of establishing guilt and, thus, the error in this case is trial error.* Accordingly, the double jeopardy clause does not bar retrial on the means of establishing guilt for which there was sufficient evidence presented at trial.

96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30 (internal citations omitted) (emphases added).

The defendant in *Jones* was convicted of five counts of sexual assault including (1) one count of sexual assault in the second degree, HRS § 707–731(1)(a) (1993); (2) one count of attempted sexual assault in the second de-

9. Article I, section 10 of the Hawai'i Constitution states in pertinent part as follows:

No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a pre-liminary hearing held as provided by law, except in cases arising in the armed forces when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy....

gree, HRS §§ 705–500 (1993) and 707–731(1)(a); (3) one count of sexual assault in the fourth degree, HRS § 707–733(1)(b) (1993); and (4) two counts of sexual assault in the fourth degree, HRS § 707–733(1)(a) (1993). *Id.* at 163, 29 P.3d at 353. The defendant had argued at trial that the "[c]omplainant had consented to his sexual advances. The prosecution, on the other hand, argued that the evidence showed [the c]omplainant's lack of consent and also focused on [the c]omplainant's youth, arguing that [the d]efendant was a con artist who took advantage of a young girl." *Id.* at 164, 29 P.3d at 354. The circuit court instructed the jury as to two "alternative means" by which the prosecutor could overcome the defendant's defense of consent. "The first way—the prosecution's primary theory—was to prove that [the c]omplainant did not consent at all, i.e., 'the absence of consent.' The second way was to prove that, even if [the c]omplainant consented, such consent was ineffective." *Id.* at 168, 29 P.3d at 358 (citing HRS § 702–235 (1993)). In *Jones,* the ineffective consent statute, HRS § 702–235,

provide[d] that consent is not a defense if:

(1) It is given by a person who is legally incompetent to authorize the conduct alleged [Ground 1]; or

(2) *It is given by a person who by reason of youth,* mental disease, disorder, or defect, or intoxication is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct alleged [Ground 2]; or

(3) It is given by a person whose improvident consent is sought to be prevented by the law defining the offense [Ground 3]; or

(4) It is induced by force, duress or *deception* [Ground 4].

*Id.* at 168, 29 P.3d at 358 (emphases added). In *Jones,* "[t]he prosecution concede[d] that the trial court's instruction as to ineffective consent was erroneously given because there was insufficient evidence to support such an instruction." *Id.* at 167, 29 P.3d at 357. However, the prosecution further acknowledged that "the record reflect[ed] that there

was some evidence and argument to the jury supporting some of the grounds of ineffective consent." *Id.* Specifically, "[t]he prosecution, in its opening brief, argued that, although subsections (1) and (3) of the ineffective consent statute were inapplicable because there was no evidence adduced in support thereof, 'there was evidence adduced in support of both subsections (2) and (4) [of the ineffective consent statute].'" *Id.* at 178 n. 20, 29 P.3d at 368 n. 20. The prosecution had argued in part that, due to the complainant's youth and the defendant's deception, the defendant was able to engage in sexual acts with the complainant, thereby implicating the ineffective consent statute, HRS § 702–235. Thus, *Jones* said that trial error occurred "based, in part, on [the] conclusion that the jury instruction regarding ineffective consent raised the *possibility* that the verdict was based on an alternative means of establishing guilt not supported by legally sufficient evidence[.]" *Id.* at 184 n. 30, 29 P.3d at 374 n. 30 (emphasis added).

As a result, *Jones* was faced with the issue of "whether the ineffective consent instruction constituted reversible error where it is possible that the jury found [the d]efendant guilty based upon one of the grounds of ineffective consent, despite the prosecution's failure to meet its burden of proof as to that ground." *Id.* at 178, 29 P.3d at 368. Stated another way, the issue was whether, "in an alternative means case where it is impossible to tell which alternative the jury's verdict is based upon, does due process require that each of the alternative means presented to the jury be supported by legally sufficient evidence?" *Id.*

*Jones* concluded that "[a] defendant's rights are clearly prejudiced where the jury is instructed that it may find him guilty based upon a theory of guilt that is not supported by sufficient evidence as a matter of law." *Id.* at 181, 29 P.3d at 371. However, as noted previously, reversal was not required in *Jones* because it was "trial error" to instruct the jury as to the alternative means of ineffective consent, but "retrial is not barred when the reviewing court reverses a case due to trial error, *such as erroneous jury instructions.*" *Id.* (emphasis

added). Thus, the fact that "[t]he double jeopardy clause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction[,]" *id.*, was not applicable in *Jones* inasmuch as the fundamental issue in that case was characterized by this court as trial error in the form of erroneous jury instructions. *Id.* In contrast, the issue in the instant case is clearly the sufficiency of the evidence.

### C.

The ICA's determination that the evidence was sufficient to sustain Petitioner's conviction, *Kalaola,* 2009 WL 1507291, at *3, was wrong. As discussed *supra,* the conduct on the second floor was not supported by substantial evidence. Because only one count was charged, it is impossible to determine which of the multiple acts the jury relied upon in convicting Petitioner.

The difference between trial error and insufficiency of the evidence serves to distinguish the instant case from others in which this court has remanded for a new trial. In *Arceo,* the defendant was charged with, and convicted of, two counts of sexual assault. 84 Hawai'i at 3, 928 P.2d at 845. At trial, the prosecution offered evidence of multiple instances of sexual assault in support of the defendant's conviction without electing which specific acts the jury should rely upon for each count. *Id.* at 6, 928 P.2d at 848. As noted before, *Arceo* held that "[the defendant's] constitutional right to a unanimous verdict" demands that either the prosecution elect the specific act on which the charge is based or the court give a specific unanimity instruction. *Id.* at 2–3, 928 P.2d at 844–45. Because neither had occurred, this court remanded for a new trial on those counts. *Id.* at 33, 928 P.2d at 875.

In discussing the specific incidents of sexual penetration and sexual contact that the minor witness testified to, *Arceo* plainly identified each distinct act that could have been charged as a separate count, stating that the minor witness testified

> that, during the time period charged in the indictment, [the defendant] *subjected him to five separate and distinct acts of sexual penetration*—twice by inserting his finger into the [minor witness's] anus (on each occasion, in the shower located in the shelter), once by inserting his penis into the [minor witness's] anus (while the [minor witness] was sleeping on the bed provided by the shelter), and twice by performing fellatio upon the [minor witness] (also while the [minor witness] was in the bed)—*and two separate and distinct acts of sexual contact*—once by placing his penis on the [minor witness's] penis (while the [minor witness] was in the bed) and once by placing his penis on the [minor witness's] back (also while the [minor witness] was in the bed)[.]

*Id.* at 23, 928 P.2d at 865 (footnote omitted) (emphases added).

*Arceo* further explained that "the prosecution stipulated that the indictment returned against [the defendant] in this case covered '*all* alleged sexual assaults of the [minor witness] by [the defendant] during the specified period while they were living on Maui.' " *Id.* at 24, 928 P.2d at 866 (emphasis added). Thus, "*the two separate and distinct acts of sexual* contact to which the [minor witness] testified at trial were directly subsumed within Count One of the indictment, and the *five separate and distinct acts of sexual penetration* to which he testified at trial were directly subsumed within Count Two." *Id.* at 24, 928 P.2d at 866 (emphases added). The discussion in *Arceo* continued by setting forth each of the elements of the offense and noted which acts related to which elements. With regard to the three material elements of sexual assault in the first degree, *Arceo* set them forth as being

> (1) that [the defendant] subjected the [minor witness] to sexual penetration (i.e., the prohibited conduct, to wit, anal intercourse, fellatio, or the intrusion of [the defendant's] finger into the [minor witness's] anal opening); (2) that [the defendant] was aware that he was doing so (i.e., the requisite knowing state of mind with respect to the actor's conduct); and (3) that the [minor witness] was less than fourteen years old at the time of the sexual penetration (i.e., the attendant circumstance of the [minor witness's] age).

*Id.* at 14, 928 P.2d at 856 (footnote and internal citations omitted). *Arceo* also set forth the four material elements of sexual assault in the third degree as

(1) that [the defendant] subjected the [minor witness's] to sexual contact (i.e., the prohibited conduct, to wit, the touching of the [minor witness's] back with [the defendant's] penis or the touching of the [minor witness's] penis with [the defendant's] penis); (2) that [the defendant] was aware that he was doing so (i.e., the requisite knowing state of mind with respect to the actor's conduct); (3) that [the defendant] was aware that the [minor witness] was not married to him (i.e., the requisite knowing state of mind with respect to the attendant circumstance implicit in "sexual contact,"); and (4) that the [minor witness] was less than fourteen years old at the time of the sexual contact (i.e., the attendant circumstance of the [minor witness's] age).

*Id.* at 15, 928 P.2d at 857 (citations omitted).

*Arceo* observed that remand was based on "'trial error' and [on the fact that] the evidence adduced at trial was *clearly* sufficient to support [defendant's] convictions[.]" *Id.* at 33 n. 40, 928 P.2d at 875 n. 40 (citing *Wallace*, 80 Hawai'i at 413–14, 910 P.2d at 726–27) (emphasis added). This detailed account in *Arceo* of each individual act as it related to the elements of the two charged offenses leaves no question that there was substantial evidence upon which to base a conviction as to *each* underlying act. *Arceo* would not have discussed each act without indicating that an act lacked substantial evidence, inasmuch as *Arceo* remanded the case for retrial after detailing the acts related to the subject counts.

Thus, *Arceo* stated that, "[b]ecause our disposition of the present appeal is grounded in 'trial error' *and the evidence adduced at trial was clearly sufficient to support [the defendant's] convictions, double jeopardy concerns are not implicated by a new trial.*" *Id.* at 33 n. 40, 928 P.2d at 875 n. 40 (emphasis added). This statement plainly signifies that *Arceo* had concluded that each underlying act of a count was sufficient to support a conviction. *Id.* at 33 n. 40, 928 P.2d at 875 n.

40. The conclusion in *Arceo* that the prohibition against double jeopardy was not violated because (1) the remand was due to trial error *and* (2) there was sufficient evidence to sustain the convictions on each of the multiple acts of a count means that remand is not permitted when one of the multiple acts is not supported by substantial evidence. *See* discussion *supra.* In *Arceo*, the court's failure to give the unanimity instruction was trial error, resulting in remand, and not a lack of substantial evidence requiring reversal. *See also State v. Kassebeer*, 118 Hawai'i 493, 511, 193 P.3d 409, 427 (2008) (remanding for a new trial after the circuit court plainly erred by not *sua sponte* giving the jury a specific unanimity instruction when the prosecution did not elect the specific act upon which the conviction was based); *State v. Auld*, 114 Hawai'i 135, 142, 157 P.3d 574, 581 (App.2007) (remanding for a new trial because the circuit court erred in not giving the jury a specific unanimity instruction as to the victim of the act when there were multiple victims of an act).

Furthermore, *Arceo* allows the prosecution an opportunity to present evidence of multiple acts to the jury under separate counts or elect the specific act to be relied upon for the charged offense. *Arceo*, 84 Hawai'i at 27 n. 30, 928 P.2d at 869 n. 30 (stating that "the prosecution remains free to charge multiple counts of separate and distinct acts" or "to elect the particular act on which it is relying at the close of its case-in-chief"). This court has stated that "the purpose of an *Arceo* unanimity instruction is to eliminate *any ambiguity* that might infect the jury's deliberations respecting the particular conduct in which the defendant is accused of engaging and that allegedly constitutes the charged offense." *Kassebeer*, 118 Hawai'i at 508, 193 P.3d at 424 (citing *Valentine*, 93 Hawai'i at 208, 998 P.2d at 488) (emphasis added). In the instant case, there remains an "ambiguity" regarding the particular incident for which Petitioner was convicted. The purpose behind an *Arceo* instruction would be defeated if conviction follows when some of the acts underlying a count are not supported by substantial evidence and there is

no way to ascertain whether the jury relied on those acts in convicting a defendant.

*State v. Mundon,* 121 Hawai'i 339, 355, 219 P.3d 1126, 1142 (2009), involved multiple acts and double jeopardy. In that case, this court reversed the defendant's conviction for Terroristic Threatening in the First Degree (TT1). *Id.* The defendant was charged with two separate counts of TT1. The jury convicted the defendant of one count and acquitted him of the other, but had not been instructed that it must be unanimous as to the specific act constituting the basis for the conviction. *Id.* The fact that the jury was not required to agree unanimously as to which count was the basis for conviction and which count was the basis for acquittal created "a 'genuine possibility' that different jurors concluded that [the defendant] committed different acts[.]" *Id.* at 354, 219 P.3d at 1141. Thus, *Mundon* determined that an *Arceo* instruction was required because "[t]he language of the indictment as to each count was identical" and, thus, neither count specified which act related to which offense. *Id.*

The failure to give a unanimity instruction in *Mundon* would have amounted to trial error requiring remand. However, remand in that case would have raised double jeopardy concerns because the jury "was *never informed which act committed by Mundon coincided with [which] counts[.]*" *Id.* (emphasis in original). The inability to ascertain which act corresponded to the appropriate count meant it was possible that if the case were remanded, the defendant could be retried for a count of TT1 for which he had been, in fact, acquitted by the jury. This would have violated his right not to be prosecuted for the same offense twice. *Id.* at 355, 219 P.3d at 1142 (citing *State v. Higa,* 79 Hawai'i 1, 5, 897 P.2d 928, 932 (1995)).

As discussed previously, similar concerns are present in the instant case. It is impossible to know for which multiple acts the jury convicted Petitioner. The presence of substantial evidence as to one of the two acts does not sufficiently guarantee that Petitioner would not be subjected to the risks double jeopardy was intended to avoid. If this court were to remand for a new trial, it is possible that Petitioner could be retried for conduct

the jury had rejected as a basis for legal liability in the first trial. The prosecution could have resolved these ambiguities by electing a particular act or by alleging particular acts in separate counts. Accordingly, in my view, the conviction must be reversed.

## VIII.

The majority concludes that there was not substantial evidence to support Petitioner's conviction for Petitioner's actions upstairs at ATM. However, the majority would have this case remanded for a new trial on the act that occurred downstairs. The majority argues that 1) this opinion's reading of *Arceo* is incorrect, majority opinion at 60–62, 237 P.3d at 1126–28 2) *Jones* is controlling and requires this court to remand for a new trial, *id.* at 58, 237 P.3d at 1124 3) principles of double jeopardy are extended beyond what is set forth in Hawai'i and federal case law, *id.* at 51–58, 237 P.3d at 1117–24 and 4) the disposition requested by Petitioner at the ICA should be taken in the instant case, *id.* at 51, 237 P.3d at 1117. But contrary to the majority's position, *Jones* does not control the outcome of this case. As *Jones* itself indicated, the analysis pertaining to multiple acts was not germane to resolving the issues of alternative means. *Jones* stated:

> Because the prosecution correctly charged [the d]efendant with separate counts of sexual assault with respect to each distinct culpable act or incident, the danger present in *Arceo*—that the jury did not agree upon which independent incident constituted the charged offense—was not presented by the consent instruction in this case.

*Jones,* 96 Hawai'i at 172, 29 P.3d at 362. Thus, I respectfully disagree with the majority.

## A.

The majority's first argument is that, in *Arceo,* "[t]here is no indication that this court concluded, based on [the minor witness's] equivocal testimony, that there was substantial evidence to support" each of the multiple acts. Majority opinion at 61–62, 237 P.3d at 1127–28 (citing *Arceo,* 84 Hawai'i at 10, 928

P.2d at 852). According to the majority the evidence in *Arceo* was sufficient to support the defendant's " *'convictions*[,]' " but not that each underlying multiple act contained substantial evidence. *Id.* (quoting *Arceo,* 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40) (emphasis in original).

However, in *Arceo,* as indicated *supra,* the prosecution adduced substantial evidence of multiple acts underlying each count to support the defendant's conviction. The discussion in *Arceo* of the minor witness's testimony related largely to 1) the defendant's argument that the prosecution should be limited to presenting evidence of a single incident for each count and testimony of other bad acts should be excluded, and 2) the prosecution's counter-argument that the defendant's sexual assaults constituted a continuing offense requiring the admission of all the instances of sexual assault. *Arceo,* 84 Hawai'i at 5–9, 928 P.2d at 847–51. The prosecution argued that the acts should be regarded as continuing offenses because

"[m]inors can rarely be expected to recall the specific date, time, and details of repeated sexual offense[s]." *Id.* at 6, 928 P.2d at 848. To that end, this court stated, "Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? *Clearly not.* As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are *unnecessary* to sustain a conviction." *Id.* at 13, 928 P.2d at 855 (quoting *People v. Jones,* 270 Cal.Rptr. 611, 792 P.2d 643, 655–56 (1990)) (emphases added).[10] In examining the record, *Arceo* noted that, during the trial, the minor witness "purported to recall seven *separate, distinct, and specific* sexual assaults, perpetrated by [the defendant], that occurred either in the shower or the bedroom of the shelter during the period of time when he and [the defendant] sojourned there." *Id.* at 24 n. 25, 928 P.2d at 866 n. 25 (emphasis added).[11] Accordingly, in *Ar-*

**10.** It should be noted that the law regarding testimony on dates, times, and places is a separate area of law and does not relate to the sufficiency of the evidence. The majority portrays the minor witness's testimony as "equivocal," majority opinion at 61–62, 237 P.3d at 1127–28, because he was unable to "recall whether distinct culpable acts had even occurred on more than one occasion[,]" *id.* at 61 n. 13, 237 P.3d at 1127 n. 13 (citing *Arceo,* 84 Hawai'i at 8–10, 928 P.2d at 850–52). However, based on the defendant's conviction, it is obvious that the jury accepted the testimony of the minor witness. In any event, this does not in any way detract from the conclusion that there was substantial evidence to support the defendant's conviction for each of the seven individual acts.

**11.** The majority's statement that, in *Arceo,* the prosecutor's stipulation as to the counts including all acts was to "avoid double jeopardy" concerns in that case has no bearing on whether substantial evidence supported each act. Majority opinion at 61 n. 12, 237 P.3d at 1127 n. 12 (citing *Arceo,* 84 Hawai'i at 6, 928 P.2d at 848). This statement in *Arceo* concerning seven acts is quoted to highlight the fact that the multiple acts alleged to support the defendant's conviction were subsumed in a single count, but that each act was clearly identified in that case. However, in attempting to inject doubt into the sufficiency of the evidence, the majority refers to the complaining witness's grand jury testimony where he recounted nine distinct instances of sexual assault, *id.* (citing *Arceo,* 84 Hawai'i at 5, 928 P.2d at 847), and then refers to the transcript on the defendant's motion in limine where the defen-

dant's counsel asserted that the complaining witness had testified " 'on two different occasions that there were 12 separate instances' of sexual assault[,]" *id.* (citing *Arceo,* 84 Hawai'i at 7, 928 P.2d at 849). Despite this effort by the majority, it is undisputed that, from the complaining witness's testimony *at trial,* this court identified "seven *separate, distinct, and specific* sexual assaults, perpetrated by [the defendant]," *Arceo,* 84 Hawai'i at 24 n. 25, 928 P.2d at 866 n. 25 (emphasis added). The grand jury testimony and the motion in limine were not relevant to this court's determination that there was substantial evidence as to those underlying acts. Regardless of how the majority chooses to characterize the complaining witness, it cannot refute the plain language of this court's decision in *Arceo.*

With all due respect, the majority further confuses the matter by asserting that "this court's discussion [of *Arceo* ] identified only five types of conduct rather than seven individual acts." Majority opinion at 61 n. 12, 237 P.3d at 1127 n. 12. As stated before, the minor witness asserted that the defendant

(1) *twice* inserted his finger into the Minor's "butt" while the Minor was taking a shower; (2) inserted his penis into the Minor's "butt" while the Minor was sleeping on the bed provided by the shelter; (3) *twice* performed fellatio upon the Minor; (4) placed his penis on the Minor's penis while the Minor was on the bed; and (5) placed his penis on the Minor's back while the Minor was either on the bed or the floor of the "bedroom."

*Arceo,* 84 Hawai'i at 4–5, 928 P.2d at 846–47 (emphases added). Manifestly the five types of

*ceo*, this court determined that substantial evidence supported each act. *Arceo* noted that the prosecution was willing to amend the indictment to charge the defendant with separate charges relating to the separate acts. *Id.* at 27 n. 31, 928 P.2d at 869 n. 31. Ultimately, *Arceo* rejected the prosecution's argument with regard to continuing offenses, although it did point out that the prosecution could present multiple acts in support of a single count. *Id.* at 27, 928 P.2d at 869.

Hence, the majority's reference to the specific numerous acts alleged by the minor witness in *Arceo* as "equivocal[,]" majority opinion at 61–62, 237 P.3d at 1127–28 is incorrect. Contrary to the majority's assertion, nothing in *Arceo* indicates that the acts alleged by the minor witness were not supported by substantial evidence. It would appear self-evident that this court's statement in *Arceo* that the evidence was "*clearly* sufficient" to support the convictions, *Arceo*, 84 Hawai'i at 33, 928 P.2d at 875 (emphasis added), could only have meant that this court had determined that each of the underlying acts it had discussed as supporting the convictions rested on substantial evidence, in light of the fact that the case was remanded. It would be unreasonable to conclude that this court remanded for a new trial based on acts that were not supported by substantial evidence in light of the discussion in *Arceo*.

This court has repeatedly explained that on appeal, the standard of review is not whether the evidence would satisfy a trier of fact beyond a reasonable doubt, but rather, whether the record contains substantial evidence. *See State v. Hicks*, 113 Hawai'i 60, 70, 148 P.3d 493, 503 (2006) (citation omitted). Accordingly, as long as substantial evidence existed—as confirmed by this court's statement that the evidence was "clearly sufficient," *Arceo*, 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40,—the convictions would be upheld. The premise in *Arceo*, then, is that

the underlying acts were supported by substantial evidence. In concluding that the evidence in *Arceo* was sufficient to sustain the defendant's conviction, this court necessarily relied on the underlying acts supporting the charges.

B.

The majority's second argument is that *Jones* should control the outcome of this case because, after determining that there was insufficient evidence to support the defendant's conviction for one of two alternative means relating to the element of consent, *Jones* remanded for a new trial on the other alternative means. Majority opinion at 58, 237 P.3d at 1124. The majority reads *Jones* to mean that "the double jeopardy clause was not implicated because there was sufficient evidence 'to support a conviction'" as to one alternative, despite there being insufficient evidence to support a conviction on the other. *Id.* at 60, 237 P.3d at 1126 (quoting *Jones*, 96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30). Of course, as noted before, *Jones* itself indicated it was not relevant to a multiple act analysis as exemplified in *Arceo*.

To reiterate, in *Jones*, this court determined that it was "trial error" for the court to have submitted the instruction regarding ineffective consent to the jury. 96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30. According to *Jones*, then, because the basis for reversal was "trial error" and not insufficiency of the evidence, double jeopardy was not implicated in the remand of the case. *Id.* The majority's argument over-generalizes the holding in *Jones*. Any case involving trial error that results in remand must necessarily contain substantial evidence to avoid implicating the double jeopardy clause. In contrast to *Jones*, reversal in the instant case hinges on the prosecution's failure to adduce sufficient evidence, and not on the court's failure to properly instruct the jury.[12] *Jones* is not a

---

conduct the majority refers to consisted of seven distinct acts. Such language directly contradicts the majority.

**12.** In the instant case there was no trial error related to the sufficiency of the evidence to support each act underlying the count of failure to disperse. *See* discussion *infra*. As the majority's

quotation of *Burks* explains, trial error indicates that the "judicial process" was "defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, *incorrect instructions*, or prosecutorial misconduct." Majority opinion at 57, 237 P.3d at 1123 (quoting *Burks*, 437 U.S. at 15, 98 S.Ct. 2141) (emphasis added). As already

case where a defendant is tried, and on appeal it is determined that the prosecution failed to adduce substantial evidence for the multiple acts underlying a count, as in *Arceo*. This distinction between trial error and insufficiency of the evidence in such a context is crucial, inasmuch as it explains why this court remanded in *Jones* but should reverse in the instant case.[13]

In explaining the various justifications for the prohibitions against double jeopardy, the majority quotes this court's statement in *State v. Quitog*, 85 Hawai'i 128, 938 P.2d 559 (1997), that multiple trials subject a criminal defendant " 'to embarrassment, expense and ordeal and compel[ ] him to live in a continuing state of anxiety and insecurity, as well as enhanc[e] the possibility that even though innocent he may be found guilty.' " Majority opinion at 51–52, 237 P.3d at 1117–18 (quoting *Quitog*, 85 Hawai'i at 140, 938 P.2d at 571). The presence of sufficient evidence as to one of the two acts does not sufficiently guarantee that Petitioner would not be subjected to the risks that double jeopardy was intended to avoid. As already discussed *supra*, because 1) this court is unable to determine whether the jury's decision rested on the act unsupported by substantial evidence and whether it would have acquitted of the other act, 2) retrial may place defendant at the risk of being tried again for an act for which he may, in effect, have been acquitted, and 3) the prosecution was in a position to avoid the predicament by charging in separate counts or by electing the specific act, the protections of double jeopardy must be extended to Petitioner. These factors were not present in *Jones*.

Additionally, the majority asserts that remand in *Jones* raises the same concern " 'that the jury may have acquitted' the defendant in *Jones* of the alternative means" for which there was sufficient evidence. Majority opinion at 60 n. 11, 237 P.3d at 1126 n.

11. However, as explained before, there is an additional reason why reversal is appropriate. As noted in *Jones*, "the prosecution correctly charged [the d]efendant with *separate* counts of sexual assault with respect to *each distinct culpable act or incident*." *Jones*, 96 Hawai'i at 170, 29 P.3d at 360 (emphases added). Accordingly, the jury's decision as to each act was readily discernible. *Jones* stated:

> With respect to whether the statutory alternatives in this case may be treated as alternative means, it is not significant that the jury may have reached different conclusions regarding whether [the c]omplainant did not consent or any apparent consent was ineffective, *i.e.*, meaningless, *because such differences do not reflect disagreement as to the specific incident charged.*

*Id.* at 176, 29 P.3d at 366. In other words, if the jury chose to convict or acquit, no question would arise as to its decision with respect to each act. Therefore, there was a basis in *Jones* by which to confirm the jury's verdict as to the act underlying each count. By charging each act as a separate count, the prosecution provided the basis for this court to ascertain the jury's decision as to each act. The guilty verdict premised on the underlying act in each count left no question as to what the jury in *Jones* decided as to *each* act.

Hence, in *Jones*, remand was appropriate because there was no risk that the defendant would be retried for acts for which the defendant might have been acquitted by the jury. There, the jury's verdict manifested that it found the defendant was guilty of the *separately charged* acts of sexual assault. In other words, there was no question as to the commission of the underlying acts, and thus, remand did not present any risks to the

---

explained, none of the errors found by the ICA relate to the prosecution's failure to adduce sufficient evidence to sustain a conviction as to the underlying multiple acts.

**13.** Referring to *Jones*, the majority maintains that this opinion "does not explain why requiring a nexus between trial error and insufficiency of the evidence is necessary[.]" Majority opinion at

59 n. 10, 237 P.3d at 1125 n. 10. However, this opinion does not say that a nexus is required. As noted *supra*, *Jones* itself ordered remand because this court characterized the fundamental reason for remanding as trial error due to a defective jury instruction. The question here is whether there was substantial evidence to support the multiple acts charged in one count.

double jeopardy rights of the defendant in *Jones*.[14]

But in Petitioner's case, there is no way to know how the jury decided as to each of the multiple acts presented to it under the one count charged. If this court remands the instant case for a new trial on the act supported by substantial evidence, there is a genuine possibility that the jury may have acquitted Petitioner of the act that would be remanded pursuant to the majority's approach.[15]

Also, the majority attempts to relate the facts in Petitioner's case to trial error in *Jones*, stating that "it is undisputed that trial error occurred in the instant case, insofar as the [court] failed to properly instruct the jury concerning (1) the statutory definition of 'disorderly conduct' and (2) the applicability of the 'knowingly' state of mind to each ele-

ment of the offense of failure to disperse." Majority opinion 42 (citing *Kalaola*, 2009 WL 1507291, at *2). The majority fails to explain how this establishes any relevant connection between *Jones* and the instant case.[16]

The basis for reversal here is not trial error, but rather, the double jeopardy concerns discussed *supra*. The conclusion that one of the underlying acts was not supported by substantial evidence did not result from any trial error by the court, and is in no way related to the conclusion that trial error occurred because the jury was not properly instructed as to the statutory definition of "disorderly conduct" or the "knowingly" state of mind. Here, the trial error recognized by the ICA has no connection to double jeopardy concerns or substantial evidence.[17] For these reasons *Jones* is inapposite and not controlling.

14. The majority states that *Jones* remanded the alternative means with respect to lack of consent for retrial "despite the fact that there was 'a genuine possibility that the jury may have acquitted' the defendant" based on the remaining alternative means. Majority opinion at 60 n. 11, 237 P.3d at 1126 n. 11. From this the majority infers that this court should also remand the remaining act in this case. However, as already explained, *Jones* was expressly a trial error case, and thus, double jeopardy concerns were not implicated. *Jones*, 96 Hawai'i at 184 n. 30, 29 P.3d at 374 n. 30 (stating that "retrial is not barred when the reviewing court reverses a case due to trial error, such as erroneous jury instructions"). In the instant case, the double jeopardy concerns arise inasmuch as Petitioner could be retried for an act for which the jury might have acquitted him.

15. The majority avers that the instant case cannot be distinguished from *Jones*, because in *Jones*, "there was no basis by which to confirm the jury's verdict as to each alternative means[,]" but this court "nevertheless remanded the defendant's case for retrial on the alternative means that was supported by sufficient evidence[,]" majority opinion at 60 n. 11, 237 P.3d at 1126 n. 11 (citing *Jones*, 96 Hawai'i at 184, 29 P.3d at 374). However, the majority's analogy is incorrect.

It cannot be disputed that there was no doubt in *Jones* as to the jury's verdict regarding the underlying *act* supporting conviction. Rather, the doubt in that case stemmed from uncertainty as to whether the jury convicted on the basis of the erroneous instruction or the instruction supported by substantial evidence. In *State v. Nichols*, 111 Hawai'i 327, 335, 141 P.3d 974, 982 (2006), this court stated that "it is ultimately the

trial court that is responsible for ensuring that the jury is properly instructed." (Citation omitted.) Again, then, remand in *Jones* was the result of an incorrect instruction with regard to ineffective consent, 96 Hawai'i at 183–84, 29 P.3d at 373–74, rather than on the basis of sufficiency of evidence as in the instant case. Thus, *Jones* is inapposite.

16. The majority asserts that this opinion "discount[s] the presence of trial error in this case by apparently contending that the disposition in *Jones* is proper only where insufficiency of the evidence occurs as a direct result of trial error[.]" Majority opinion at 59 n. 10, 237 P.3d at 1125 n. 10. However, as already explained, the presence of the trial error found by the ICA in this case is irrelevant because it bears no relation to the outcome. Neither the majority's decision to remand, nor this opinion's conclusion that Petitioner's conviction should be reversed, is compelled by the presence of trial error. In other words, if there were no trial error issue in this case, both the majority and this opinion would reach their respective conclusions with regard to the sufficiency of the evidence issue.

17. Additionally, the majority maintains that "the instant case does not 'hinge on' insufficiency of the evidence to any greater extent than *Jones*." Majority opinion at 59 n. 10, 237 P.3d at 1125 n. 10. With all due respect, this statement demonstrates that, again, the majority disregards the distinction between the failure of the circuit court in *Jones* to correctly instruct the jury and the failure of the prosecution in the instant case to adduce substantial evidence for the multiple acts underlying Petitioner's conviction.

## C.

The majority's third argument is that this opinion extends double jeopardy protections beyond what is set forth in Hawai'i and federal case law. At the outset it should be noted that all of the cases cited by the majority are inapposite inasmuch as they do not address the situation where one of the underlying acts in a multiple acts case is not supported by substantial evidence. The majority's assertion that the extension of double jeopardy protections to Petitioner "is without support in [Hawai'i] case law," majority opinion at 55–56 n. 9, 237 P.3d at 1121–22 n. 9, is wrong inasmuch as the outcome in the instant case is dictated by this court's decision in *Arceo* and this court's case law. On the other hand, the cases cited by the majority concern issues of trial error (but insufficiency of the evidence is involved in this case); acquittals based on a single act unsupported by substantial evidence (but the instant case involves multiple acts, one of which was supported by substantial evidence and one that was not); convictions for lesser included offenses (but there are no lesser included offenses in this case); and federal precedent (but federal precedents set forth minimum protections, and do not control the state constitution).[18]

Relying on *State v. Feliciano*, 62 Haw. 637, 618 P.2d 306 (1980), for the proposition that " 'a defendant may not be retried for any offense of which he has been acquitted, whether expressly or impliedly,' " *id.* at 18, 618 P.2d 306 (quoting *Feliciano*, 62 Haw. at 644, 618 P.2d at 311), the majority argues that an express determination by either the court or the jury is required before retrial is barred. It should be noted that this court's decision in *Feliciano* followed the holding of *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). *Green* held that, when a defendant is convicted of a lesser included offense and the case is subsequently vacated and remanded for trial error, the defendant may only be retried for the lesser included offense of which he or she was convicted. *Id.* at 187–88. *Green* stated:

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, *as well as enhancing the possibility that even though innocent he may be found guilty.*

*Id.* (emphasis added). *See also Ball v. United States*, 163 U.S. 662, 669, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) (stating that "[t]he prohibition is not against being twice punished, but against being twice put in jeopardy").

The majority quotes this same language to support its argument that double jeopardy protections should only be extended where there has been an acquittal in some form. Majority opinion at 51–52, 237 P.3d at 1117–18.[19] However, this language is equally applicable to Petitioner's case, in that, by re-

---

18. This court has stated on numerous occasions that "we are not precluded from interpreting our state constitution to afford greater protection than that required by federal constitutional interpretations and have not hesitated to do so where warranted by logic and due regard for the purposes of those protections." *Housing Fin. and Dev. Corp. v. Castle*, 79 Hawai'i 64, 85, 898 P.2d 576, 597 (1995) (citation omitted); *see also Wallace*, 80 Hawai'i at 397 n. 14, 910 P.2d at 710 n. 14 (citation omitted); *State v. Hoey*, 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994) (citation omitted); *State v. Kam*, 69 Haw. 483, 491, 748 P.2d 372, 377 (1988) (citation omitted); *Hawaii Hous. Auth. v. Lyman*, 68 Haw. 55, 69, 704 P.2d 888, 896 (1985) (citing *State v. Kaluna*, 55 Haw. 361, 369, 520 P.2d 51, 58 (1974)); *State v. Texeira*, 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967).

19. Thus, the majority contends that, "so long as there was sufficient evidence to support a conviction, double jeopardy bars retrial only when there was an acquittal, express or implied." Majority opinion at 59 n. 10, 237 P.3d at 1125 n. 10. According to the majority, "confirmation as to the basis for the jury's verdict is not required where there is substantial evidence to support a conviction." *Id.* at 60 n. 11, 237 P.3d at 1125 n. 11.

However, double jeopardy concerns raised by uncertainty as to the jury's decision on the remaining act in this case should bar remand. Moreover, the prosecution was in a position to avoid such concerns by charging each count separately or electing the specific act upon which the conviction is based.

manding for a new trial he may be "twice put in jeopardy" where the prosecution failed to adduce sufficient evidence at the first trial. Indeed, remanding for trial when the prosecution did not adduce sufficient evidence to support a conviction for all the multiple acts would only serve to "enhanc[e] the possibility" of a conviction inasmuch as this court is unable to ascertain whether the jury rejected liability for the act supported by substantial evidence. *Id.* (quoting *Quitog*, 85 Hawai'i at 140, 938 P.2d at 571).

The majority mentions the Supreme Court's decision in *Burks*, majority opinion at 57, 237 P.3d at 1123, which held that "[t]he [d]ouble [j]eopardy [c]lause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." 437 U.S. at 11, 98 S.Ct. 2141. However, this opinion is not inconsistent with *Burks* or any of the other federal cases cited by the majority. In *Burks*, the petitioner had been convicted of bank robbery. *Id.* at 3, 98 S.Ct. 2141. The petitioner appealed his conviction to the sixth circuit, which determined that there was insufficient evidence to sustain the conviction, but vacated and remanded for a new trial. *Id.* at 3–4, 98 S.Ct. 2141. After concluding that the double jeopardy clause bars retrial after a determination that the evidence was insufficient to sustain a conviction, *id.* at 11, 98 S.Ct. 2141, the Court reversed the petitioner's conviction inasmuch as there was not sufficient evidence adduced at trial, *id.* at 18, 98 S.Ct. 2141.

The result for which this opinion advocates does nothing to undermine the protections that either *Burks* or Hawai'i law have thus far afforded defendants. But rather, greater protection is afforded to Petitioner under Hawai'i law than that required by federal law. *See, e.g., Mundon,* 121 Hawai'i at 365,

219 P.3d at 1152 ("[W]e are free to give broader protection under the Hawai'i Constitution than that given by the federal constitution.") (Brackets and citation omitted.); *State v. Viglielmo,* 105 Hawai'i 197, 211, 95 P.3d 952, 966 (2004) (noting that "Hawaii's double jeopardy clause provides defendants broader protection than [its] federal counterpart") (citation omitted); *State v. Rogan,* 91 Hawai'i 405, 423, 984 P.2d 1231, 1249 (1999) ("Given the inadequacy of the [federal double jeopardy standard], we take this opportunity, 'as the ultimate judicial tribunal with final unreviewable authority to interpret and enforce the Hawai'i Constitution,' to 'give broader protection under the Hawai'i Constitution than that given by the federal constitution.'" (Quoting *Hoey,* 77 Hawai'i at 36, 881 P.2d at 523).); *Quitog,* 85 Hawai'i at 130 n. 3, 938 P.2d at 561 n. 3 (stating that, because the Hawai'i Constitution affords greater rights, "we need not-and do not-address the question whether the double jeopardy clause of the fifth amendment to the United States Constitution would dictate the same result and express no opinion in that regard"); *State v. Lessary,* 75 Haw. 446, 457–59, 865 P.2d 150, 155–56 (1994) (concluding that interpretation given to double jeopardy clause of fifth amendment by United States Supreme Court does not adequately protect individuals "subject for the same offense [from being] twice put in jeopardy," therefore requiring additional protection under Hawai'i Constitution (quoting Haw. Const. art. I, § 10)). Thus, *Burks* is inapposite.[20]

The majority cites *State v. Bannister,* 60 Haw. 658, 594 P.2d 133 (1979), to urge that, because there was substantial evidence to convict Petitioner of failure to disperse based on his acts on the first floor, the prosecution did not fail to make its case. Majority opin-

---

**20.** The majority agrees that federal precedent does not prevent this court from extending broader double jeopardy protections in the instant case. Majority opinion at 52 n. 7, 237 P.3d at 1118 n. 7. However, the majority implies that, because "this court has cited with approval the principles derived from each of the federal cases relied upon herein[,]" *id.,* this court is restricted to those principles in the instant case. It does not follow that having approved of those principles, they should now serve to restrict the protec-

tions afforded under the Hawai'i Constitution. Those double jeopardy cases and principles were cited with approval because they set forth the minimum double jeopardy protections under federal law, and did not, as the majority implies, circumscribe the application of this state constitution's double jeopardy clause. As the aforementioned cases demonstrate, this court has confirmed double jeopardy protections beyond those set forth by the Supreme Court.

ion at 56–57, 237 P.3d at 1122–23 (citing *Bannister*, 60 Haw. at 660, 594 P.2d at 135). *Bannister* involved the prosecution of defendant for theft of property exceeding two hundred dollars. *Id.* at 661, 594 P.2d at 134. At trial, the prosecution offered the hearsay testimony of the defendant's manager, who asserted that the value of the property stolen was more than two hundred dollars, but submitted no invoice as to the actual value of the goods stolen. *Id.* at 660, 594 P.2d at 135. This court concluded that the hearsay evidence was insufficient, and that the failure to adduce sufficient evidence as to the amount stolen meant that the defendant could not be convicted of the offense. *Id.* Additionally, the court concluded that double jeopardy barred the defendant from being retried for the same offense. *Id.*

Although *Bannister* does involve sufficiency of the evidence for a single act, it does not in any way address the issue of insufficiency of evidence where multiple acts are present as in the instant case. Furthermore, the majority's citation to *Bannister* highlights a failure to recognize that in multiple acts cases, the presence of sufficient evidence as to the remaining acts is not enough to address the uncertainty that arises when it is unclear what the jury decided as to the other act. In other words, despite there being sufficient evidence as to one of the multiple acts, there is no way of knowing what the jury decided as to those acts. The prosecution's failure to prove its case with regard to all of the underlying acts, and the attendant concern that Petitioner may be retried for an act for which the jury may have decided he was not guilty, is what distinguishes this case from *Bannister* and the other cases cited by the majority.

For that same reason, the majority's citation to *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), is unpersuasive. The majority cites *Tateo* for the proposition that "[i]t would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error[.]" Majority opinion at 52, 237 P.3d at 1118 (citing *Tateo*, 377 U.S. at 466, 84 S.Ct. 1587). However, it cannot be said that

any benefit society may derive from retrying Petitioner would outweigh the loss of double jeopardy protections. As the majority notes, double jeopardy " 'imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside[,]' *for reasons other than insufficiency of the evidence* [.]" *Id.* at 52, 237 P.3d at 1118 (quoting *State v. Jess*, 117 Hawai'i 381, 439 n. 28, 184 P.3d 133, 191 n. 28 (2008) (citations and internal quotation marks omitted)) (emphasis added). Inasmuch as the instant case hinges on sufficiency of the evidence, retrial should be barred.

The majority also argues that, in contrast to *Mundon*, Petitioner in the instant case "was never acquitted by a jury for either of the two alleged acts of failure to disperse." *Id.* at 56, 237 P.3d at 1122. Thus, according to the majority, Petitioner is not in jeopardy of being retried for an act of which he had been acquitted. As explained *supra*, the defendant in *Mundon* was charged, *inter alia*, with two counts of TT1, but was ultimately convicted of only one count. 121 Hawai'i at 355, 219 P.3d at 1126. This court determined that the defendant was entitled to, but did not receive, a unanimity instruction as to the two TT1 counts. *Id.*

However, *Mundon* could not be vacated and remanded for a retrial as to the count of which he was convicted because "[t]he language of the indictment *as to each count* was identical." *Id.* at 354, 219 P.3d at 1141 (emphasis added). Because neither count specified which act related to which offense, there was no way to know which act formed a basis for conviction and which for acquittal. *Id.* at 355, 219 P.3d at 1126. Remand for a new trial on those counts would present the possibility that the defendant would be retried for the act or acts of which he had been acquitted. *Id.* The majority ignores the similar "double jeopardy concerns," *Arceo*, 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40, present in the instant case inasmuch as Petitioner faces the risk of being retried for acts of which the jury may have decided he was not guilty.

As noted before, the majority argues that because "there was no express jury verdict of

acquittal[,]" majority opinion at 53, 237 P.3d at 1119, the harm is too "speculat[ive]" "to implicate the protections of the double jeopardy clause[,]" *id.* at 55–56 n. 9, 237 P.3d at 1121–22 n. 9. However, remand is inadequate in light of the risks Petitioner faces on retrial. *See Arceo,* 84 Hawai'i at 33 n. 40, 928 P.2d at 875 n. 40. As explained *supra,* it is incorrect to characterize the double jeopardy risks to Petitioner as merely "speculative" if his case were to be remanded. There is a legitimate concern that he could be retried for an act for which the jury had found him not guilty, and such concerns underlie the double jeopardy protections this court has afforded defendants.

Furthermore, the cases cited by the majority are inapposite. *Quitog* dealt with issues entirely unrelated to those in the instant appeal, stating that "the outcome of the present appeal turns *neither* on the 'legal sufficiency of the evidence' to support [the defendant's] attempted second degree murder conviction *nor* on the presence of 'trial error,' as that term was contemplated in *Burks* and *Wallace[.]*" *Quitog,* 85 Hawai'i at 140 n. 21, 938 P.2d at 571 n. 21 (emphases added). Similarly, *Feliciano* involved different questions. In *Feliciano,* the defendant was charged with attempted murder, but the jury convicted him of the lesser included offense of Reckless Endangering in the Second Degree. 62 Haw. at 640, 618 P.2d at

309. During the jury's deliberations, the circuit court gave the jury a supplemental instruction which rendered the initial instruction "unclear[.]" *Id.* at 642, 618 P.2d at 310. This court reversed due to the circuit court's trial error in improperly instructing the jury and remanded for a new trial on only the lesser included offense. *Id.* at 644, 618 P.2d at 311. Manifestly, the instant case does not implicate either the trial error or the double jeopardy concerns relating to lesser included offenses present in *Feliciano,* inasmuch as there are no lesser included offenses in this case. Nor is the instant case controlled by *Whiting v. State,* 88 Hawai'i 356, 966 P.2d 1082 (1998),[21] or *State v. Loa,* 83 Hawai'i 335, 926 P.2d 1258 (1996),[22] inasmuch as both those cases also involved the double jeopardy bar to retrial after a conviction for a lesser included offense.

The majority concedes that the cases it cites regarding implied acquittals are inapposite. However, the majority concludes that these cases "support[ ] the inference that the doctrine of implied acquittals does not extend to the circumstances of the instant case." Majority opinion at 55–56 n. 9, 237 P.3d at 1121–22 n. 9. In other words, the majority maintains that, because the factual scenarios in *Feliciano, Whiting,* and *Loa* do not encompass those in the instant case, it must be inferred that the implied acquittal doctrine is also inapplicable.[23] This reasoning disre-

21. In *Whiting,* the defendant was charged with murder in the second degree, but the jury convicted him of the lesser included offense of manslaughter due to extreme mental or emotional disturbance (EMED manslaughter). 88 Hawai'i at 358, 966 P.2d at 1084. On appeal, his conviction was reversed due to trial error. *Id.* The difficulty in that case was that EMED manslaughter could not be charged as its own separate offense because it was a combination of offenses. *Id.* The ICA held that the defendant could be retried for murder, but if found guilty of second degree murder, he could only be sentenced to EMED manslaughter. *Id.* This court reversed, concluding that, regardless of whether the defendant could only be convicted of EMED manslaughter, he could not be retried for second degree murder. *Id.* at 361, 966 P.2d at 1087. Because he had been acquitted of that charge and convicted of the lesser included offense, the second trial for that offense would violate double jeopardy. *Id.* Manifestly, nothing in the facts of *Whiting* is analogous to the instant case.

22. In *Loa,* the trial court instructed the jury that it could convict the defendant of attempted first degree murder or a lesser included offense of attempted reckless manslaughter. 83 Hawai'i at 357, 926 P.2d at 1280. The jury returned a conviction for attempted reckless manslaughter, however, this court concluded that no such offense existed. *Id.* Because the jury did not convict of the greater charged offense, double jeopardy barred the defendant's prosecution for that crime, despite there being no lesser included offense with which to retry the defendant. *Id.* at 361, 926 P.2d at 1284. Again, this court's decision in *Loa* does not support the majority's arguments inasmuch as that decision involved unrelated issues and demonstrate only that this court had adopted an expansive view with regard to double jeopardy protections.

23. The majority maintains that "this court has repeatedly recognized that, as long as there was sufficient evidence presented to support the conviction of the defendant for the charged offense,

gards the fact that what should dictate the outcome in this case is not the similarity with other implied acquittal cases, but rather, as the discussion of *Arceo* makes clear, the double jeopardy concerns relating to the presence of insufficient evidence in the context of multiple acts. The majority's argument that this opinion extends the doctrine of implied acquittal, majority opinion at 56, 237 P.3d at 1122, is wrong, inasmuch no reliance is placed upon either the implied acquittal doctrine or cases, and they are discussed only in response to the majority's assertions.

The majority also cites to the decision of the ICA in *State v. Pesentheiner*, 95 Hawai'i 290, 291, 22 P.3d 86, 87 (App.), *cert. denied* 96 Hawai'i 71, 26 P.3d 29 (2001), to support its contention that an express finding by the jury is necessary before double jeopardy is implicated. Majority opinion at 54–55, 237 P.3d at 1120–21. In *Pesentheiner*, the defendant was convicted at a bench trial of Harassment, pursuant to HRS § 711–1106(1)(a) (Supp.2000), after he allegedly swung his arms in the direction of a police officer and knocked the hat off of a police officer's head. 95 Hawai'i at 292, 22 P.3d at 88. HRS § 711–1106(1)(a) required proof that the defendant had the intent to "harass, annoy, or alarm any other person[.]" Although the trial court concluded that the defendant was "reckless" in waving his arms around the police officer, it nevertheless found the defendant guilty despite recklessness being insufficient to prove the mental state required. *Id.* at 301, 22 P.3d at 97. As the ICA stated, "nothing less than the 'intent to harass, annoy, or alarm' specified in the harassment statute could suffice in this case." *Id.* at 300, 22 P.3d at 96. The defendant argued that his conviction should be reversed inasmuch as the court's finding was insufficient to convict.

However, the ICA remanded for a new trial, stating that "[t]he court's erroneous assumption that recklessness was sufficient for conviction rendered it unnecessary, under

that assumption, to go further in considering the evidence than a finding that [the defendant] recklessly waved his arms[,]" and that if "the court applied the correct *mens rea* standard in its consideration of the evidence, it would have been further required to assess the weight and credibility of [the police officer's] description of the *actus reus*." *Id.* at 301, 22 P.3d at 97. In other words, the ICA concluded that the court had not gone on to consider all of the evidence because it erroneously believed that recklessness was sufficient to convict, and that a correct understanding of the *mens rea* element would have resulted in the trial court further examining the *evidence*. *Id.*

However, *Pesentheiner* does not add any weight to the majority's contention that express findings should be made before double jeopardy bars retrial inasmuch as *Pesentheiner* did not purport to resolve the issues specific to the instant case. The fact that the trial court failed to make an adequate finding with regard to the defendant's mental state presents a completely different situation. In *Pesentheiner*, the ICA was able look to the record to determine exactly on what basis the trial court rested its decision to convict. The ICA concluded that the trial court's findings, although not sufficient to convict, were not inconsistent with guilt. *Id.* In contrast, the record in the instant case does not provide any indication as to what the jury decided with regard to the remaining act. It may have found him guilty of the act or it may have concluded he was not guilty. In other words, there is no assurance, in contrast to *Pesentheiner*, that retrial would not place Petitioner in jeopardy of being tried for an act for which the finder of fact determined he was not guilty.

Another plain distinction between *Pesentheiner* and the instant case is the ICA's correct determination that the error in *Pesentheiner* was "*trial error*, as [opposed to] evidentiary insufficiency" and, thus, did "not constitute a decision to the effect that the

---

the double jeopardy clause bars a retrial only when there was in fact an acquittal, whether express or implied." Majority opinion at 46, 237 P.3d at 1112. However, in all of the cases that the majority cites to support this proposition, the conclusion the jury had reached as to the guilt or

innocence of the defendant for each underlying act and charged offense *was clear*. As was explained, Petitioner's case provides none of these assurances and leaves this court uncertain as to whether he will be retried for an act of which the jury may have acquitted him.

government has failed to prove its case." *Id.* (citation omitted) (emphasis added). In concluding that the defendant could be convicted of the offense of harassment based on the conclusion that the defendant was reckless, the trial court committed an error analogous to improperly instructing the jury, except that it essentially improperly instructed itself. Consequently, the ICA's decision in *Pesentheiner* has no relevance to the conclusion in this opinion.

The majority also quotes Professor La-Fave to the effect that, while assessing " 'the impact of a *trial error* always presents uncertainties, whether the result is a conviction or acquittal, only in the latter situation is there concrete evidence, in the form of a not guilty verdict, that the jury may have resolved factual issues in favor of the defendant's innocence.' " Majority opinion at ——, 237 P.3d at 1121 (quoting Wayne R. LaFave, et al., *Criminal Procedure* § 25.3(b) at 631–32 (3d ed.2007)) (emphasis added and emphasis omitted). Again, the majority relies on a situation in which the issue is one of *trial error*, whereas the instant case is one in which the prosecution failed to adduce sufficient evidence.

### D.

The majority maintains that because there was neither an express acquittal nor a conviction on a lesser included offense, there cannot be certainty that the jury did, in effect, acquit Petitioner of any acts. Majority opinion at 55, 237 P.3d at 1121. But there is uncertainty as to which of the acts the jury based its conviction. There is no disagreement that one of the acts offered as a basis for conviction was unsupported by substantial evidence. The jury could have convicted Petitioner of the act lacking substantial evidence. The jury could have convicted Petitioner of the act supported by substantial evidence. However, it is also entirely possible that the jury had in effect found Petitioner not guilty on the acts supported by substantial evidence. What the majority cannot guarantee is that, on remand, Petitioner will not be retried for an act for which the jury had already decided he should be treated as not guilty. The majority's assertion that

double jeopardy protection is unwarranted, majority opinion at 55–56 n. 9, 237 P.3d at 1121–22 n. 9, disregards this substantial risk.

### IX.

### A.

Finally, the majority notes that on appeal to the ICA Petitioner requested that his case be remanded for a new trial on the acts supported by substantial evidence as opposed to the reversal granted by this court. Majority opinion at 51, 237 P.3d at 1117. However, inasmuch as the double jeopardy issue was noticeable as plain error, it would be unreasonable to limit the resolution of this case to the relief requested where the issue involves substantial rights.

The Supreme Court's decision in *Burks* employed a similar rationale. The petitioner in *Burks* was charged with bank robbery, and his main defense at trial was that he was insane and was "substantially incapable of conforming his conduct to the requirements of the law." 437 U.S. at 2–3, 98 S.Ct. 2141. After the jury convicted the petitioner, *he moved for a new trial on the basis that there was insufficient evidence to support his conviction. Id.* at 3, 98 S.Ct. 2141. The district court denied the motion, but the court of appeals for the sixth circuit "reverse[d] and remand[ed] the case to the district court where the defendant [would have been] entitled to a directed verdict of acquittal unless the government present[ed] sufficient additional evidence to carry its burden on the issue of defendant's sanity." *Id.* at 4, 98 S.Ct. 2141 (citation omitted). According to the Supreme Court, "[t]he [c]ourt of [a]ppeals assumed it had the power to order this 'balancing' remedy *by virtue of the fact that [the petitioner] had explicitly requested a new trial." Id.* at 5, 98 S.Ct. 2141 (emphasis added).

*Burks* ultimately rejected the sixth circuit's conclusion, holding that "[t]he [d]ouble [j]eopardy clause *forbids a second trial* for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Id.* at 11, 98 S.Ct. 2141 (emphasis added). Im-

**90**

portantly, *Burks* also concluded that *"it makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy.* It cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial." *Id.* at 17, 98 S.Ct. 2141 (emphasis added). On the issue of whether a defendant can waive his or her double jeopardy rights, such reasoning is supportive.

As discussed *supra*, double jeopardy is exactly the type of substantial right noticeable as plain error. *See Miyazaki*, 64 Haw. at 616, 645 P.2d at 1344 (stating that this court has "previously held that a defendant's right to be free from double jeopardy is just such a substantial right as to be noticeable by the court" (citing *Martin*, 62 Haw. at 373, 616 P.2d at 199)). Furthermore, although not raised in the briefs, the question of whether remanding Petitioner's case would violate double jeopardy was raised at oral argument. The issue discussed in oral argument is precisely the one treated here; that is, whether remanding for a new trial on the alternative means and multiple acts supported by substantial evidence would implicate double jeopardy concerns. Thus, any notion of the majority that discussion of double jeopardy should be barred is wrong.

### B.

The majority's conceptual concerns are unwarranted because the prosecution is in a position, and has been since before *Arceo* was decided, to avoid this problem by either 1) presenting each act as a separate charge or 2) electing the specific act upon which it is seeking a conviction. *See Arceo*, 84 Hawai'i at 27 n. 30, 928 P.2d at 869 n. 30 (stating that "the prosecution remains free to charge multiple counts of separate and distinct acts" or "to elect the particular act on which it is relying at the close of its case-in-chief"). The majority quotes *Arceo*, stating that

> requiring either a unanimity instruction or an election "is not intended to ... encourage the bringing of multiple charges when, in the prosecutor's judgment, they are not warranted. The criteria used to determine that only a single charge should be brought[ ] may indicate that the election of

one particular act for conviction is impractical."

Majority opinion at 62 n. 14, 237 P.3d at 1128 n. 14 (quoting *Arceo*, 84 Hawai'i at 31, 928 P.2d at 873). However, nothing in this opinion is inconsistent with *Arceo*. As *Arceo* explained, the decision whether to charge a defendant with multiple counts, to charge a single count supported by multiple acts, or to elect a specific act is still within the prosecution's "discretion," 84 Hawai'i at 31, 928 P.2d at 873, subject to this court's review. It is still entirely up to the prosecutor to determine whether charging multiple counts of separate acts or electing a single act would be "impractical." Thus, the majority's concerns are unfounded.

### X.

For the foregoing reasons, I would reverse the ICA's June 26, 2009 judgment and the court's April 18, 2008 judgment, and remand to the court to enter a judgment of acquittal.